USCA1 Opinion

 

United States Court of Appeals
For the First Circuit

Nos. 02-1677, 02-1717

UNITED STATES OF AMERICA,
Appellee,

v.

ANGEL CASAS,
Defendant, Appellant.

No. 02-1708
UNITED STATES OF AMERICA,
Appellee,

v.

JOSÉ BONILLA-LUGO,
Defendant, Appellant.

No. 02-1716
UNITED STATES OF AMERICA,
Appellee,

v.

JOHN CORREY, A/K/A EARTH,
Defendant, Appellant.

No. 02-1996
UNITED STATES OF AMERICA,
Appellee,

v.

ANGEL LUIS PIZARRO-MORALES, A/K/A WEE,
Defendant, Appellant.

No. 02-1997
UNITED STATES OF AMERICA,
Appellee,

v.

RAMÓN FLORES-PLAZA,
Defendant, Appellant.

No. 02-2124
UNITED STATES OF AMERICA,
Appellee,

v.

RAYMOND NICOLAI-CABASSA, A/K/A RAY,
Defendant, Appellant.
 

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Carmen Consuelo Vargas de Cerezo and
Hon. Héctor M. Laffitte, U.S. District Judges]

Before
Torruella, Lynch and Lipez,
Circuit Judges.

    Luis M. Cháves-Ghigliotty, for appellant Angel Casas.
    Terrance J. McCarthy, for appellant José Bonilla-Lugo.
    Donna R. Newman, for appellant John Correy.
    Mauricio Hernández-Arroyo, for appellant Angel Luis Pizarro-Morales.
    Rodney S. Dowell, with whom Berman & Dowell, was on brief, for
appellant Ramón Flores-Plaza.
    Linda George, for appellant Raymond Nicolai-Cabassa.
    Miguel A. Fernández, with whom Lisa Snell-Rivera, Assistant
United States Attorneys, and H.S. García, United States Attorney,
were on brief, for appellee.

October 7, 2005

         TORRUELLA, Circuit Judge. Appellants were convicted of 
conspiracy to possess with intent to distribute approximately 1400
grams of heroin and 9445 kilograms of cocaine, in violation of 21
U.S.C. §§ 841(a)(1) and 846. They now challenge their convictions
and their sentences. We affirm their convictions but vacate their
sentences and remand for re-sentencing.
I. Background
         On May 21, 1994, Special Agents Jay Stoothoff ("Agent
Stoothoff") of the Drug Enforcement Administration ("DEA") and
Richard Escalera of the Immigration and Naturalization Service were
conducting surveillance at the Luis Muñoz Marín International
Airport in Carolina, Puerto Rico. They saw two vehicles, a Pontiac
TransAm carrying four people and an Isuzu Trooper carrying two
people, pull up to the departure area together. After observing
suspicious interactions between certain passengers of the vehicles
and American Airlines employees, the agents approached the vehicles
and identified themselves as police officers. One of the
individuals fled on foot, while two individuals sped away in the
TransAm. The Trooper was left with the doors open and engine
running, and the agents detained the other three individuals. The
agents secured four suitcases from the scene. These suitcases were
found to contain eighty-one kilograms of cocaine. One of the
detained individuals, Héctor Martínez-Medina ("Martínez-Medina"),
accompanied the agents to a house where all six individuals met
prior to going to the airport. The house belonged to the father of
Israel Pérez-Delgado ("Pérez"). The Isuzu Trooper was registered
to Pérez.

         This series of events eventually led to the exposure of
the drug conspiracy that gave rise to this case. On August 8,
1996, the grand jury returned a six-count superseding indictment
against sixty defendants, including appellants. Count One of the
indictment charged all the defendants with conspiracy to possess
with intent to distribute approximately 1400 grams of heroin and
9445 kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1),
846. Count Two charged appellant Angel Luis Pizarro ("Pizarro")
and various co-defendants not part of this appeal with possession
with intent to distribute approximately eighty-one kilograms of
cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. 
Count Three did not charge any of the appellants. Count Four
charged appellants John Correy ("Correy") and Raymond Nicolai-Cabassa ("Nicolai"), as well as co-defendant Thomas Martínez
("Martínez"), who is not part of this appeal, with possession with
intent to distribute approximately thirty-six kilograms of cocaine,
in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Counts
Five and Six charged Correy and Nicolai with the intentional
killings of José Miguel Blanco-Rodríguez ("Blanco") and Ramón de
Jesús-Molina ("de Jesús").
         United States District Judge Carmen Consuelo Vargas de
Cerezo presided over a jury trial for ten of the co-defendants,
including appellants, in the United States District Court for the
District of Puerto Rico. Trial began on May 12, 1999 and lasted
approximately seven months. The jury convicted all of the
appellants of Count One, convicted Pizarro of Count Two, acquitted
Correy of Count Four, and acquitted Correy and Nicolai of Counts
Five and Six.
         On April 17, 2002, pursuant to an order of the First
Circuit Judicial Council, the case was reassigned to the Honorable
Héctor M. Laffitte for sentencing. Judge Laffitte sentenced the
appellants on various dates between May 7, 2002 and July 18, 2002. 
Appellants have timely appealed both their convictions and their
sentences to this court.
II. Discussion
         Appellants challenge their convictions and sentences on
numerous grounds. We address each of these grounds in turn.

A. Conviction
         1. Delay
         Appellants Correy, Pizarro, and Nicolai argue that their
convictions should be reversed and the indictments against them
dismissed because the delay between their indictment and trial
violated their rights under the Speedy Trial Act ("STA"), 18 U.S.C.
§ 3161, and the Sixth Amendment of the Constitution. Appellants
were originally indicted on December 13, 1995, and a superseding
indictment was filed on August 8, 1996. Trial commenced on May 12,
1999, approximately forty-one months after appellants were
indicted.
                a. Speedy Trial Act
         We review decisions on issues of fact relevant to the STA
for clear error and review questions of law de novo. United States
v. Maxwell, 351 F.3d 35, 37 (1st Cir. 2003). The STA requires that
trial commence within seventy days of the filing of an indictment,
or the first appearance of the defendant in court, whichever is
later. 18 U.S.C. § 3161(c)(1). Periods of delay arising from the
causes outlined at 18 U.S.C. § 3161(h)(1)-(9) are excluded from the
calculation. Included in these periods of delay are those
"resulting from any pretrial motion, from the filing of the motion
through the conclusion of the hearing on, or other prompt
disposition of, such motion." Id. § 3161(h)(1)(F). If trial does
not commence by the end of seventy days plus the excluded periods,
the "indictment shall be dismissed on motion of the defendant." 
Id. § 3162(a)(2). Nicolai moved to dismiss on the basis of an STA
violation on March 3, 1998, and Pizarro claims to have joined the
motion.

 Correy filed a pro se motion to dismiss for delay on
July 22, 1998 and moved to dismiss for lack of prosecution and
violation of the Sixth Amendment on April 30, 1999. Although
Correy's motions never mentioned the STA by name, we will assume,
as did the prosecution and district court, that his motions were
sufficient for purposes of § 3162(a)(2). Our review of the
district court's refusal to dismiss the indictment turns on whether
delays resulting from the pendency of motions filed by appellants
and their co-defendants are excluded from the seventy-day limit.
         Appellants each claim that the STA clock began running on
their respective dates of first appearance, and that the seventy-day deadline was far exceeded. However, among the periods excluded
from the STA limit are "reasonable period[s] of delay when the
defendant is joined for trial with a codefendant as to whom the
time for trial has not run and no motion for severance has been
granted." Id. § 3161(h)(7). The Supreme Court has interpreted
this section to mean that the clock does not, in effect, begin to
run until the date of the most recent defendant's initial
appearance before the court. See Henderson v. United States, 476
U.S. 321, 323 n.2 (1986) (finding that STA clock begins on the date
of last co-defendant's arraignment because "[a]ll defendants who
are joined for trial generally fall within the speedy trial
computation of the latest codefendant") (citing 18 U.S.C. § 3161(h)
(7)); United States v. Barnes, 251 F.3d 251, 257-59 (1st Cir. 2001)
(applying Henderson to find that district court properly reset STA
clock on date superseding indictment was filed to add a new
defendant); see also United States v. Maxwell, 351 F.3d 35, 38 (1st
Cir. 2003) (applying Barnes to find that period between appellant's
arraignment and co-defendant's later arraignment is excluded from
STA calculation). Appellants were among ten defendants severed for
trial from the remaining fifty who were charged in the superseding
indictment. The last of these ten to appear before the court was
Nicolai, on November 6, 1996. Accordingly, the STA clock started
no earlier than that date, 917 days before trial.

         Our precedent makes clear that "any defendant's motion
resulting in excludable time toll[s] the STA clock for his
codefendants." United States v. Santiago-Becerril, 130 F.3d 11, 19
(1st Cir. 1997) (collecting cases). Accordingly, the government
argues that delays during the pendency of motions filed by
appellants' co-defendants must be excluded from the STA
calculation. See 18 U.S.C. § 3161(h)(1)(F), (h)(7). The
government argues that once the delays during the pendency of
motions filed by appellants' co-defendants are counted, fewer than
seventy non-excludable days accrued. Unfortunately, the government
neglected to provide this court with the dates or length of any
delays so occasioned during the more than two-year interval between
Nicolai's initial appearance and trial.

         This case began with sixty co-defendants, a number that
was cut down to ten by the time of trial. The co-defendants filed
numerous motions, and there were also many hearings and appearances
before the district court prior to trial. After carefully
examining the record, we have concluded that such motions and
proceedings tolled the STA for the bulk of the time between
Nicolai's initial appearance and trial. The number of non-excludable days for STA purposes, due to the various motions and
hearings, was far less than seventy.

         Appellants Pizarro and Nicolai argue that the exclusion
of delays during the pendency of a co-defendant's motion must be
reasonable, see 18 U.S.C. § 3161(h)(7), and therefore other
considerations -- such as whether the defendant seeking dismissal
asserted his speedy trial rights or contributed to the delay --
play a role in calculating the number of excludable days. 
Defendants rely on Barnes. See 251 F.3d at 259 (finding no STA
violation but noting that "[t]he Henderson rule anticipates
exceptions" and that "in other, less exigent circumstances, the
clock may not prove to be so elastic"). According to appellants,
because they did not contribute to their delay and because they
asserted their speedy trial rights, their STA clocks should be
considered separately from the clocks of their co-defendants. 
Appellants have not argued that the joining of various co-defendants for trial was unreasonable for STA purposes.
         Appellants' reliance on Barnes is misplaced, and their
claims that they were not responsible for any delays are
inaccurate. Barnes involved the re-trial of a defendant after this
court vacated her original conviction and ordered her indictment
dismissed without prejudice because the government had violated the
STA. See id. at 254. A grand jury promptly issued a second
indictment. One day before the defendant-appellant's STA deadline,
a grand jury issued a superseding indictment that added a second
defendant. This court found no STA violation but expressed concern
because the government, "after once violating the appellant's STA
rights, . . . filed the superseding indictment only one day before
the STA clock was to expire again." Id. at 259 (emphasis in
original). In other words, the Barnes court was concerned with the
appearance of possible manipulation of the STA by the government. 
In the instant case, however, the causes of delay were the numerous
motions filed by the co-defendants, including appellants Pizarro
and Nicolai, who between them filed at least thirty-six motions
from November 6, 1996 through May 12, 1999, the date trial began.
         Further, Barnes involved the joining of a co-defendant,
not the filing of pretrial motions, and therefore concerned § 3161
(h)(7), not § 3161(h)(1)(F). The Supreme Court has interpreted §
3161(h)(1)(F) not to have any "reasonableness" requirement such as
the one present in § 3161(h)(7). See Henderson, 476 U.S. at 326-28; Maxwell, 351 F.3d at 38. Therefore, appellants' argument that
delays caused by pretrial motions filed by their co-defendants were
unreasonable finds no support in Barnes and has been rejected by
the Supreme Court in Henderson.

         Due to the pendency of motions filed by co-defendants,
the number of non-excludable days for STA purposes between
Nicolai's indictment and trial was less than seventy. Accordingly,
no STA violation occurred.
                b. Sixth Amendment
         Although unusual, it is possible for a delay that does
not violate the STA to run afoul of the Sixth Amendment's guarantee
of a speedy trial. United States v. Salimonu, 182 F.3d 63, 69 (1st
Cir. 1999); see also 18 U.S.C. § 3173 (STA not a bar to Sixth
Amendment claim). Appellants allege that delays between their
indictment and trial, and between their conviction and sentencing,
violated the Sixth Amendment's guarantee of "a speedy and public
trial." U.S. Const. amend. VI.
         In Barker v. Wingo, 407 U.S. 514 (1972), the Supreme
Court identified four factors to be considered in determining
whether an appellant's speedy trial rights have been violated: (1)
the length of the delay, (2) the reasons for the delay, (3) the
defendant's assertion of his speedy trial right, and (4) prejudice
to the defendant caused by the delay. Id. at 530-32. However,
"none of the four factors . . . [is] either a necessary or
sufficient condition to the finding of a deprivation of the right
of speedy trial. Rather, they are related factors and must be
considered together with such other circumstances as may be
relevant." Id. at 533.
         The length of pretrial delay is calculated from either
arrest or indictment, whichever occurs first. See United States v.
Muñoz-Amado, 182 F.3d 57, 61 (1st Cir. 1999). Correy and Pizarro
were both indicted prior to their arrest, in December 1995. 
Nicolai was arrested on November 6, 1996, although he was already
incarcerated in New York after having pled guilty to unrelated
charges. Thus, all three waited over forty months for trial. This
time period far exceeds the one-year point at which pretrial delay
is generally considered to be presumptively prejudicial. See
Santiago-Becerril, 130 F.3d at 21-22 (quoting Doggett v. United
States, 505 U.S. 647, 652 n.1 (1992)). Accordingly, the length of
delay weighs in favor of appellants' claim of a Sixth Amendment
violation.
         The second factor, however, weighs against appellants. 
They allege that the delay was caused largely by the unpreparedness
of the government, and the inability of the judicial system to cope
with their case. We disagree. Sixty people were indicted in this
large, complex drug conspiracy case. Well over 350 pretrial
motions were filed between the initial indictment and trial. 
Pizarro filed thirteen pretrial motions, including two motions to
continue the trial (Docket No. 504, 531);

 two motions to change
his plea (Docket Nos. 701, 916), each of which was withdrawn months
later, shortly before the scheduled change of plea hearing (Docket
Nos. 766, 974); and three motions for his court-appointed attorney
to withdraw (Docket Nos. 635, 746, 974), resulting in additional
delay while a new attorney was appointed. Correy filed nineteen
pretrial motions, including one to continue the trial. (Docket No.
533).

 Nicolai filed twenty-eight pretrial motions, including two
for a continuance or severance. (Docket No. 532, 1040).
         Appellants have alleged no bad faith effort by the
government to delay the proceedings. Nor do we agree with
appellants' assertion that the delay was caused by the judicial
system's inability to cope with a case this size. From our review
of the record, the district court disposed of the co-defendants'
numerous motions in a timely manner and moved the case along to
trial. Instead, it appears that delays were due in large part to
the resolution of pre-trial matters concerning appellants and their
co-defendants.

 Further, while a case of this size is certainly
unwieldy, the joint prosecution of defendants involved in the same
drug trafficking conspiracy is justified as a means of serving the
efficient administration of justice. Accordingly, we find that the
reasons for the delay are sound and weigh against a finding of
Sixth Amendment violation.
         With regard to the third factor, the government concedes
that all three appellants asserted their speedy trial rights in
motions filed with the district court. We find, therefore, that
the third factor weighs in appellants' favor.
         We evaluate the fourth factor, prejudice, "in the light
of the interests of defendants which the speedy trial right was
designed to protect[:] . . . (i) to prevent oppressive pretrial
incarceration; (ii) to minimize anxiety and concern of the accused;
and (iii) to limit the possibility that the defense will be
impaired." Barker, 407 U.S. at 532. All three appellants were
detained for more than forty-one months prior to trial and likely
experienced the disadvantages thereof identified by the Supreme
Court in Barker, such as idleness, loss of employment, and
disruption of family relationships.

 Id. Lengthy detention is not
necessarily, however, "[]sufficient to establish a constitutional
level of prejudice." Santiago-Becerril, 130 F.3d at 23 (finding
fifteen months' pretrial detention insufficient to establish
prejudice); see also Barker, 407 U.S. at 533-34 (finding that
"prejudice was minimal" despite "extraordinary" five-year delay
because defendant was only held in pretrial detention for ten
months).
         The fact that appellants' detention was forty-one months
(almost three times the length considered in Santiago-Becerril)
causes us great concern. However, we believe that other
counterbalancing factors outweigh this deficiency and prevent
constitutional error. Appellants have not alleged that the
conditions of their confinement were unduly oppressive, and the
time served was credited against the sentences they received upon
conviction. Cf. Barker, 407 U.S. at 533 (stating that "[i]t is
especially unfortunate to impose [the disadvantages of pretrial
detention] on those persons who are ultimately found to be
innocent"). Moreover, at least some of the delay during
appellants' pretrial detention was attributable to their own
actions, insofar as the many motions they filed required
consideration and disposition by the district court.
         Appellants also allege that they suffered prejudice in
the form of "anxiety and concern," id. at 532, about the outcome of
the proceedings. However, "[w]hile this type of prejudice is not
to be brushed off lightly, considerable anxiety normally attends
the initiation and pendency of criminal charges; hence only undue
pressures are considered." United States v. Henson, 945 F.2d 430,
438 (1st Cir. 1991) (internal quotation marks and citations
omitted); see also United States v. Colombo, 852 F.2d 19, 25 (1st
Cir. 1998) (emphasizing that Barker requires minimization, not
elimination, of "the natural consequences of an indictment"). 
Correy and Nicolai both claim that, because they were indicted on
murder charges, they experienced heightened concern that they might
have to defend themselves against a death sentence, and Correy
claims that he was distracted thereby from preparing his defense on
other charges. See 21 U.S.C. § 848(e) (providing for death
penalty). The government, however, never filed notice that it
would seek the death penalty. See 18 U.S.C. § 3593. Accordingly,
we think that the potential anxiety arising from Correy and
Nicolai's indictment on a death-eligible charge was minimized and
did not exert "undue pressure" upon them.
         Finally, Nicolai and Pizarro claim that their defense was
impaired as a result of the delay between indictment and trial. 
The Supreme Court identified this as "the most serious [consequence
of delay] . . . because the inability of a defendant adequately to
prepare his case skews the fairness of the entire system." Barker,
407 U.S. at 532. In particular, Nicolai notes that government
agents' debriefing notes of government witness José Vélez-Román
("Vélez") were unavailable because they had been destroyed by
Hurricane George in 1998, and that he was unable to present
Alexandra Brocksman as a defense witness because she became ill. 
We note that the issue of the missing notes came up at trial while
Pizarro's counsel, not Nicolai, was cross-examining a government
witness. Nicolai does not appear to have ever sought access to the
notes and has not explained how the destruction of the notes
prejudiced him in any way. Regarding the availability of Alexandra
Brocksman, Nicolai has not explained how the passage of time
prevented him from calling Brocksman as a witness. We note also
that, while Nicolai states in his brief that Brocksman did not
appear because she was ill, he alleged below that Pérez had
threatened Brocksman prior to her failure to appear as a defense
witness. See United States v. Nicolai-Cabassa, No. 95-405 (D. P.R.
Dec. 9, 1999) (order requiring transcript of Nicolai's statement
regarding alleged threats made by Pérez to Brocksman). Further,
the parts of the record Nicolai cites in his brief do not even
mention Brocksman at all. For these reasons, we are unable to see
how these alleged instances were either tied to passage of time or
prejudiced Nicolai in any way.
         Both Nicolai and Pizarro claim that the principal
government witness, Pérez, blamed the passage of time for his
inability to recall certain details of the drug conspiracy he ran. 
However, "the clouded recollection of a key prosecution witness
would seem to be helpful, rather than harmful, to the defense." 
Rashad v. Walsh, 300 F.3d 27, 42-43 (1st Cir. 2002); see also
United States v. Casas, 356 F.3d 104, 113 (1st Cir. 2004) (holding
that diminished witness recall resulting from delay "'is a
two-edged sword . . . [because] [i]t is the Government that bears
the burden of proving its case beyond a reasonable doubt'")
(quoting United States v. Loud Hawk, 474 U.S. 302, 315 (1986)). 
Indeed, two of Pérez's eight references to the time lapse
identified by appellants are taken from cross-examinations that 
focused specifically on discrediting Pérez's testimony on the basis
of his inability to recall specific details. (TT 6/7/99: 84-89; TT
6/9/99: 51-53). We cannot conclude that appellants suffered any
prejudice as a result of Pérez's limited recollection.
         The forty-one months that passed between appellants'
initial indictment and trial constituted an unusually long wait,
particularly for defendants held in pretrial detention. 
Nevertheless, under the circumstances, we find that the large and
complex nature of the proceedings and the district court's
obligation to consider the multitude of pretrial matters filed by
appellants and their co-defendants are compelling reasons for the
lengthy delay, and that appellants did not suffer prejudice of a
constitutional dimension as a result thereof. We conclude that
there was no violation of the Sixth Amendment as a result of
pretrial delay.
         Finally, Pizarro and Nicolai argue that the delay between
their conviction and sentencing resulted in a denial of their Sixth
Amendment rights. They were sentenced on July 11 and July 31,
2002, respectively, approximately thirty-one months after their
December 14, 1999 convictions. While "[t]he Supreme Court has not
definitively held that [the right to a speedy trial] extends to the
sentencing phase," United States v. Nelson-Rodríguez, 319 F.3d 12,
60 (1st Cir. 2003) (citing Pollard v. United States, 352 U.S. 354,
361 (1957)), we will assume, without deciding, that it does. See
id.; see also Fed. R. Crim. P. 32(b)(1) (sentence must be imposed
"without unnecessary delay"). While the delay between conviction
and sentence was, again, unusually long in this case, it was not
without good reason. It was necessary for transcripts of the
seven-month trial to be prepared and reviewed in order to produce
pre-sentence reports (PSRs) for the defendants. In addition, a
number of post-trial motions were filed by appellants and their co-defendants. Nicolai filed twenty-two motions following his
conviction, at least three of which requested continuances or
extensions of time. Pizarro filed seventeen motions, requesting
seven continuances or extensions of time. Neither appellant claims
to have asserted a constitutional right to a speedy sentence. Nor
do they explain what prejudice resulted from the delay, except to
suggest that they were prejudiced by having to wait to file the
instant appeal. We are not convinced that they were prejudiced,
especially since some of the sentencing delay was to give
defendants the opportunity to file Rule 29 motions for acquittal
and motions for a new trial, which might have mooted the appeal had
they been successful. Thus, we find that the delay between
appellants' conviction and sentencing caused no violation of their
rights under the Sixth Amendment.
                c. Motion to sever
         Nicolai filed two motions for severance (Docket Nos. 532,
1040), one of which was noted but never ruled on (Docket No. 540),
while the other was denied without prejudice pending refiling on
December 29, 1998. (Docket No. 1074). The renewed motion was
again denied on March 12, 1999 for failure to comply with the order
providing an opportunity to amend the earlier motion. Nicolai
claims that the district court erred in denying his motions for
severance.
         We review the denial of a motion to sever for abuse of
discretion. United States v. Soto-Beníquez, 356 F.3d 1, 29 (1st
Cir. 2004).
To demonstrate abuse of discretion, defendants
must show that joinder deprived them of a fair
trial, resulting in a miscarriage of justice. 
Because the general rule is that those
indicted together are tried together to
prevent inconsistent verdicts and to conserve
judicial and prosecutorial resources,
severance is particularly difficult to obtain
where, as here, multiple defendants share a
single indictment.

Id. (internal citations omitted). See generally Zafiro v. United
States, 506 U.S. 534, 537 (1993) (noting "a preference in the
federal system for joint trials of defendants who are indicted
together").
         Nicolai claims to have been prejudiced by delay that
resulted from being tried jointly with multiple co-defendants and
points to the faster resolution of the trials of other co-defendants who were severed before trial. Regardless of whether
Nicolai's trial might have been speedier had it been severed, the
delays did not cause significant prejudice, nor did they result in
the denial of a fair trial or a miscarriage of justice. See United
States v. LiCausi, 167 F.3d 36, 48-49 (1st Cir. 1999) (determining
that appellant must show "'prejudice greater than that which
necessarily inheres whenever multiple defendants . . . are jointly
tried'") (quoting United States v. Walker, 706 F.2d 28, 30 (1st
Cir. 1983)). We therefore find no abuse of discretion in the
district court's denial of Nicolai's motions to sever.
         2. Grand jury proceedings
         Casas and Bonilla-Lugo ("Bonilla") seek dismissal of the
indictment, arguing that the prosecutor engaged in misconduct
before the grand jury by failing to disclose the existence of
alleged secret agreements with Pérez and Martínez for immunity for
the Blanco and de Jesús murders, and by knowingly presenting false
testimony. Casas argues that the false testimony came in the form
of conflicting accounts of the murders from Pérez and Martínez,
while Bonilla bases his argument on statements Martínez made at
trial that were not made in his grand jury testimony.

 Casas also
outlines each overt act in which he was implicated, challenging the
sufficiency of the evidence to support his participation.
         The petit jury's finding beyond a reasonable doubt that
appellants were guilty of the charges alleged in the indictment
"demonstrates a fortiori that there was probable cause to charge
the defendants with the offenses for which they were convicted." 
United States v. Mechanik, 475 U.S. 66, 67 (1986). Accordingly,
"all but the most serious errors before the grand jury are rendered
harmless by a conviction at trial." Soto-Beníquez, 356 F.3d at 25
(internal quotation marks omitted). "'Only a defect so fundamental
that it causes the grand jury no longer to be a grand jury, or the
indictment no longer to be an indictment' is sufficient to
invalidate a subsequent conviction." Id. (quoting United States v.
Reyes-Echevarría, 345 F.3d 1, 4 (1st Cir. 2003)). None of the
alleged errors before the grand jury rose to this level.
         With regard to the first claim, we note that the
government denies the existence of any immunity agreements for the
murders prior to the creation of supplemental cooperation
agreements during trial. See infra at 33-38. Even if we were to
assume that the agreements did exist, the prosecution's failure to
notify the grand jury thereof would not warrant dismissal of the
indictment. Because of the nature of the grand jury's function,
"[t]he prosecutor before a grand jury is not normally under a duty
to disclose exculpatory evidence. Nor . . . is the prosecutor
obligated to impeach the credibility of his own witnesses." United
States v. Latorre, 922 F.2d 1, 7 (1st Cir. 1990) (internal
quotations omitted). Moreover, the petit jury's conviction on the
conspiracy count, made with knowledge that Pérez and Martínez were
immune at trial and believed themselves to have been immune prior
to trial for liability for the murders, leads us to seriously doubt
"that a similarly informed grand jury would not have found probable
cause." United States v. Mangual-Corchado, 139 F.3d 34, 42 (1st
Cir. 1998).
         Next, neither the fact that the accounts of Pérez and
Martínez contradicted each other in certain respects, nor that
Martínez's trial testimony went beyond the scope of his grand jury
testimony, indicate that the prosecutor knowingly presented false
testimony. See United States v. Lebon, 4 F.3d 1, 2 (1st Cir. 1993)
("[T]he fact that a witness contradicts herself or changes her
story does not establish perjury."); United States v. Doherty, 867
F.2d 47, 70 (1st Cir. 1989) (finding no decision that "prohibits a
prosecutor from calling witnesses who will present conflicting
stories"); United States v. Hemmer, 729 F.2d 10, 17 (1st Cir. 1984)
("Simply because there exist[s] inconsistencies between [a
witness's] grand jury and trial testimony does not warrant the
inference that the government knowingly introduced perjurious
testimony."). Absent evidence of "prosecutorial misconduct that
actually biases the grand jury in performing its fact-finding
function," United States v. Maceo, 873 F.2d 1, 3 (1st Cir. 1989),
we can go no further.

 An indictment returned by a legally
constituted and unbiased grand jury "is not subject to challenge on
the ground that the grand jury acted on the basis of inadequate or
incompetent evidence." United States v. Calandra, 414 U.S. 338,
363 (1974). For the same reason, we will not inquire into Casas's
claim that there was insufficient evidence before the grand jury of
his participation in the overt acts listed in the indictment. A
grand jury proceeding is not a trial; only after conviction
following a trial is sufficiency of the evidence an appropriate
issue. See, e.g., Reyes-Echevarría, 345 F.3d at 5.
         3. Prosecutorial misconduct
         All six appellants claim that the proceedings below were
infected with prosecutorial misconduct to such an extent that they
were denied a fair trial. In determining "whether prosecutorial
misconduct has so poisoned the well that a new trial is required,"
we weigh several factors: "(1) the severity of the misconduct; (2)
the context in which it occurred; (3) whether the judge gave any
curative instructions and the likely effect of such instructions;
and (4) the strength of the evidence against the defendant." 
United States v. Manning, 23 F.3d 570, 574 (1st Cir. 1994). Taking
a "balanced view of the evidence in the record," United States v.
Rodríguez-De Jesús, 202 F.3d 482, 485 (1st Cir. 2000), we evaluate
the Manning factors to determine whether the misconduct likely
affected the trial's outcome. See Manning, 23 F.3d at 574. We
have noted, however, that "[t]he remedy of a new trial is rarely
used; it is warranted only where there would be a miscarriage of
justice or where the evidence preponderates heavily against the
verdict." Rodríguez-De Jesús, 202 F.3d at 486 (internal quotation
marks omitted).
         The district court denied a number of motions during and
after trial for a mistrial, a new trial, and dismissal of the
indictment on grounds of prosecutorial misconduct. (TT 8/24/99: 22-23, TT 9/30/99: 51, Docket No. 1671 (denied at Docket No. 1723);
Docket No. 1910 (denied at Docket No. 1948); Docket No. 1911
(denied at Docket No. 2049); Docket No. 1912 (denied at Docket No.
2049); Docket No. 1951 (denied at Docket No. 2049); Docket No. 2272
(denied at Docket No. 2315)). Although we determine the legal
question of whether the prosecutor's actions constitute misconduct
de novo, our review of whether the alleged misconduct requires a
new trial is for abuse of discretion. United States v. Lewis, 40
F.3d 1325, 1337-38 (1st Cir. 1994); United States v. Glantz, 810
F.2d 316, 320 n.2 (1st Cir. 1987); see also United States v.
Mooney, 315 F.3d 54, 59 (1st Cir. 2002) (motion for mistrial);
Rodríguez De-Jesús, 202 F.3d at 485 (motion for new trial); United
States v. Laboy, 909 F.2d 581, 585 (1st Cir. 1990) (motion to
dismiss indictment). Six alleged instances of prosecutorial
misconduct are outlined below.

 Although some of the tactics
employed by the prosecutor's office in its zeal to convict crossed
the line of acceptable prosecutorial conduct, we conclude that none
of the alleged actions likely affected the outcome of the trial. 
Accordingly, no new trial is warranted.
                a. Deception of Court
         Appellants all complain that the circumstances
surrounding the sentencing of Pérez and Martínez resulted from an
abuse of prosecutorial discretion insofar as prosecutors allegedly
misled the probation department and sentencing courts

 about the
Pérez's and Martínez's relevant conduct in order to secure their
cooperation as witnesses against appellants.
         Pérez was indicted, along with the three individuals
arrested for the March 21, 1994 attempt to smuggle cocaine through
the Carolina airport, on a single charge of aiding and abetting in
the possession with intent to distribute eighty-one kilograms of
cocaine. After being captured as a fugitive in October 1994, Pérez
chose to cooperate with prosecutors. On December 14, 1994, he
entered into a plea agreement with the government, under which he
received immunity in the District of Puerto Rico for "any other
crimes committed (except crimes of violence such as, but not
limited to, murder) about which [Pérez] has informed the United
States." The government agreed to recommend a Guidelines sentence
with a base offense level ("BOL") of 32,

 a three-level reduction
for acceptance of responsibility under U.S.S.G. § 3E1.1, and a two-level reduction for having a minor role in the offense under
U.S.S.G. § 3B1.2. The record reflects that by the time of Pérez's
sentencing on September 8, 1995, the prosecutor was aware that
Pérez's role in the larger conspiracy was far from minor, and that
he had been involved in the murders of Blanco and de Jesús. 
Nonetheless, the prosecutor failed to bring information about the
full extent of Pérez's relevant criminal conduct to the attention
of the probation department or sentencing judge, failed to inform
the probation department or judge that financial and other
information provided by Pérez for the pre-sentence report was
inaccurate, and failed to object to the pre-sentence report's
recommendations of guidelines reductions for acceptance of
responsibility and minor role.

 Accordingly, the sentencing judge
accepted the plea recommendations, departing, on the government's
motion, even farther below the Guidelines range for substantial
assistance under U.S.S.G. § 5K1.1.

 The resulting sentence was for
sixty months' imprisonment.
         Martínez was indicted along with appellants and
eventually agreed to plead guilty to Count Four (aiding and
abetting in the possession with intent to distribute thirty-six
kilograms of cocaine). The government agreed to a sentence based
on 4.9 kilograms of cocaine, with a three-level reduction for
acceptance of responsibility under U.S.S.G. § 3E1.1 and an
additional two-level reduction if the "safety valve" provisions of
18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2 were found to apply. 
Among other things, the "safety valve" requires that "the defendant
did not use violence or credible threats of violence . . . in
connection with the offense; [and] the offense did not result in
death or serious bodily injury to any person." 18 U.S.C. § 3553
(f)(2)-(3). Although AUSA Miguel Fernández had been present at
Martínez's grand jury testimony concerning his participation in the
Blanco and de Jesús murders (Appendix: 168, 172-79), the
government's motion requesting downward departure represented that
Martínez did qualify for the "safety valve." (Appendix: 83). The
government did not inform the sentencing judge

 –- who also
presided at appellants' trial –- of the extent of Martínez's
participation in the drug trafficking conspiracy, nor of his
participation in the Blanco and de Jesús murders. (TT 9/30/99:
48). On February 26, 1998, Martínez was sentenced to twenty-four
months' imprisonment.
         It appears that the prosecutors misled the probation
department and that sentencing courts as to the sentences of Pérez
and Martínez. Prosecutors have a duty of candor to the court. See
ABA Model Rules of Prof'l Conduct R. 3.3 (2002). That does not
mean that these defendants/appellants have any right to complain
about what happened with other defendants. But even if we assume
that the Manning factors can be used when the purported misconduct
is not directed against appellants themselves, the context in which
it occurs -– the sentencing of cooperating defendants -- renders it
unlikely to have affected the outcome of appellants' trial.

 
Further, while the courts that sentenced Pérez and Martínez may not
have been aware of the full extent of their involvement in the drug
conspiracy, the nature of both witness' activities within the
organization, including their involvement in the murders, came out
in their testimony on direct and cross-examination.

 The evidence
that they received lenient sentences in exchange for their
cooperation with the government was exploited by the defense for
its impeachment value. (TT 6/7/99: 23-36; TT 9/24/99: 12-16, 73-104). The jury was also presented evidence indicating that these
sentences resulted from the government's failure to present all
relevant evidence to the probation department and sentencing
judges, in the form of testimony from the probation officers
involved in preparing Pérez's and Martínez's pre-sentence reports
and the federal prosecutor who handled Pérez's plea agreement and
sentencing. Pérez was also cross-examined with regard to his PSR
and admitted that he lied to the probation officer who prepared it. 
(TT 6/15/99: 79). Thus, we cannot conclude that the government's
misconduct in securing low sentences for its cooperating witnesses
likely affected the outcome of appellants' trial to their
detriment.
                b. Failure to disclose immunity agreements
         Appellants next argue that the government improperly
withheld information about cooperation agreements it granted to
cooperating witnesses. The government responds that no such
agreements were withheld and that defendants suffered no prejudice
insofar as the details of all cooperation agreements were available
for use during cross-examination of the cooperating witnesses.
         During arguments outside the presence of the jury about
whether the Blanco and de Jesús murders were part of the charged
conspiracy, defense counsel inquired as to whether Pérez had been
given immunity for his participation in the murders. (TT 5/26/99:
67). Quoting from Pérez's plea agreement, which granted immunity
in the District of Puerto Rico "except for crimes of violence such
as but not limited to murder," the government argued that Pérez did
not have immunity. (TT 5/26/99: 75-76). The district court
ordered Pérez and Martínez to appear in court, with representation,
in order to be advised of their exposure to prosecution and right
not to testify to the murders. (TT 5/28/99: 3). Prior to this
appearance, the prosecutor indicated to Pérez's legal
representative that his office did not intend to charge Pérez with
the murders, on account of an internal policy against indictments
based on uncorroborated witness statements. (TT 5/28/99: 23-28). 
Shortly thereafter, supplemental cooperation agreements granting
immunity from prosecution in Puerto Rico, and the federal District
of Puerto Rico, the Southern District of Florida, and the Southern
District of New York for the two murders were negotiated with both
Pérez and Martínez. (Appendix: 107). Both supplemental agreements
were presented in court and provided to the defense.

 (TT 6/3/99:
4-5; TT 9/21/99: 9-10).
         During cross-examination on June 7, 1999, however, Pérez
stated that he began providing the government information about the
murders prior to the written immunity agreement because Agent
Stoothoff had verbally informed him that he would not be prosecuted
for the murders. (TT 6/7/99: 30-33). No such verbal immunity
agreement was brought to the attention of the defense prior to
trial. When he was recalled as a defense witness, Agent Stoothoff
denied having made such a promise. (TT 10/28/99: 18).
         About two months after Pérez testified, another former
member of the drug trafficking organization, Martínez-Medina, was
called as a government witness. The following exchange occurred at
the beginning of his testimony:
Q. Okay. Did you enter your guilty plea by
way of a common plea agreement or a
cooperation plea agreement?
 
A. There was no agreement.
 
. . .
 
THE COURT: Didn't he say there was no plea
agreement?
 
[PROSECUTOR]: No cooperation and plea
agreement but just a plea agreement, a regular
plea agreement.

(TT 8/19/99: 50-51). On cross examination, however, Martínez-Medina testified that, while he had no written cooperation
agreement, he had a verbal agreement with AUSA Mercado wherein he
understood that the government would consider filing for a
reduction of his sentence in exchange for his testimony. (TT
8/24/99: 52-53). The prosecutor acknowledged that a motion had
been filed, and granted, for an extension of the time based on an
intent to request a sentence reduction in Martínez-Medina's case. 
(TT 8/24/99: 62; TT 8/25/99: 9). The defense moved for a mistrial
on the basis that it could not be known whether other witnesses who
had already testified also had undisclosed verbal cooperation
agreements. (TT 8/24/99: 66).
         Chastising the prosecutors for their failure to formalize
such agreements in writing and to disclose them to the defense, the
district judge denied the motion, finding that defendants' rights
could be fully redressed by having the prosecutors file
representations with regard to each witness who had already
testified concerning the existence of any unwritten cooperation
agreements, and by reopening cross-examination to the defense on
any such agreements. (TT 8/24/99: 69-72). The court instructed
prosecutors to confer with other AUSAs who had worked on the case
to ensure that no cooperation agreements were overlooked, and to
disclose any such agreements not only for past witnesses, but also
for upcoming witnesses.

 (TT 8/24/99: 69-72). The court
instructed the jury, at the defense's request and using its
proposed language, that "the prosecution had the duty to reveal 
the existence of [Martínez-Medina's cooperation] agreement and
failed to do so. For that reason, the Court shall reopen the cross
examination of this witness . . . solely to allow the defendants to
examine him on that particular aspect." (TT 8/25/99: 13).
         No disclosure of any unwritten cooperation agreement was
made with regard to Martínez. However, when he testified in
September 1999, he at first stated that he did have a verbal
agreement with the government, prior to the written immunity
created during trial, that he would not be prosecuted for the
Blanco and de Jesús murders. (TT 9/24/99: 76-82). When questioned
later, however, he stated that he did not have such an agreement
and did not know why he had testified otherwise before. (TT
9/27/99: 36). The court denied another motion for mistrial, which
was based in part upon the prosecution's failure to disclose the
verbal cooperation agreements, on September 30, 1999. (TT 9/30/99:
12, 37, 51).
         Suppression of evidence favorable to the defense violates
due process. Brady v. Maryland, 373 U.S. 83, 87 (1963). The Brady
rule applies to evidence affecting key witnesses' credibility, 
Giglio v. United States, 405 U.S. 150, 153-54 (1972), and thus
would encompass the verbal cooperation agreements discussed above. 
While we note that Agent Stoothoff denied having promised that
Pérez would not be prosecuted for the murders, knowledge of any
such promise, if it existed, would be imputed to the prosecution,
along with knowledge of the promise made by AUSA Mercado to
Martínez-Medina to consider a sentence reduction if he testified
against appellants. See id. at 154; Kyles v. Whitley, 514 U.S.
419, 437 (1995). However,
"[w]hen the [Brady/Giglio] issue is one of
delayed disclosure rather than of
nondisclosure, . . . the test is whether
defendant's counsel was prevented by the delay
from using the disclosed material effectively
in preparing and presenting the defendant's
case" . . . [and] [w]e review the district
court's decision on how to handle delayed
disclosure of Brady material for abuse of
discretion.

United States v. Catano, 65 F.3d 219, 227 (1st Cir. 1995) (quoting 
United States v. Ingraldi, 793 F.2d 408, 411-12 (1st Cir. 1986)).
         Here, the defense was not prejudiced in its ability to
use the existence -- or, at any rate, the three cooperating
witnesses' belief in the existence -- of verbal cooperation
agreements to call the cooperating witnesses' credibility into
question. While the government denies having made any such
agreements with Pérez and Martínez, it is clear that the government
indicated to Martínez-Medina that a reward for cooperation would be
considered. Accordingly, the representation during direct
examination that no cooperation agreement existed was, at best,
misleading, and we strongly condemn the prosecution's failure to
correct the statement or to disclose the existence of a cooperation
agreement as required by Giglio. However, for each witness, the
existence, confirmed or otherwise, of the verbal cooperation
agreement came out during cross-examination and was sufficiently
investigated by the defense. See United States v. McGovern, 499
F.2d 1140, 1143 (1st Cir. 1974) (finding no prejudice from late
disclosure of cooperation agreement because it occurred while
witness was still on the stand and court allowed further cross-examination). No prejudice resulted to defendants.
         Although the misconduct, at least with respect to the
Martínez-Medina agreement, was serious, we find that it was
unlikely to have affected the outcome of trial when considered in
light of the opportunity for cross-examination and the curative
actions taken by the court. We thus find no abuse of discretion in
the district court's denial of a mistrial on the basis of the late
disclosure of these agreements.

                c. Violation of sequestration orders
         Nicolai, Correy, and Pizarro argue that the government
engaged in misconduct by violating witness sequestration orders. 
On May 26, 1999, Pérez was testifying but had not yet testified
about the Blanco and de Jesús murders. (TT 6/2/99: 82). Pending
before the court at that time was the issue of whether the murders
were a part of the charged conspiracy. While carrying out his
duties to escort Pérez to and from court, Agent Stoothoff discussed
with him factual issues relevant to the potential connection. (TT
6/2/99: 83-84). The defense argued that this conversation violated
the court's order that Pérez not discuss his testimony with anyone
else

 and sought to prohibit Pérez from later testifying about the
murders. Upon reviewing notes taken by the prosecutor during a
November 1995 interview in which Pérez gave the same information
that he later discussed with Agent Stoothoff, the district court
determined that the sequestration order had been violated but that
no prejudice resulted because the conversation did not alter
Pérez's testimony. (Docket No. 1294). The order also admonished
that any future contact between the government and testifying
witnesses concerning matters about which they would testify would
result in the exclusion of such testimony. (Docket No. 1294). 
Appellants have not indicated that additional violations occurred. 
We find no abuse of discretion in the district court's
determination that defendants suffered no prejudice as a result of
the violation of its somewhat ambiguous sequestration order.

                d. Offering false testimony
         Nicolai, Pizarro, and Correy assert that the government
presented testimony at trial that it knew or should have known was
false.

 Nicolai's and Pizarro's claims are readily disposed of,
as they are based on the government's presentation of Pérez's and
Martínez's conflicting accounts of the Blanco and de Jesús
murders.

 The government violates due process when it obtains a
conviction by soliciting or failing to correct false evidence. 
Napue v. Illinois, 360 U.S. 264, 269 (1959). However, "[n]either
Napue nor any other decision prohibits a prosecutor from calling
witnesses who will present conflicting stories." United States v.
Doherty, 867 F.2d 47, 70 (1st Cir. 1989). As the district court
correctly recognized, such conflicts are a matter to be explored on
cross-examination (Docket No. 1276: 7), and the credibility of each
account is for the jury to determine. In addition, we find that
appellants were not prejudiced by the conflicting testimony, which
differed in its description of Pérez's, not the charged
defendants', actions during the murders. The defendants charged
with the murders were acquitted, demonstrating that the
contradictory testimony likely undermined the credibility of both
key prosecution witnesses.
         Correy also raises a number of inconsistencies that fall
far short of showing that the witnesses in question perjured
themselves, much less that the government knowingly allowed them to
do so. First, Correy refers to Martínez-Medina's testimony that
misleadingly implied he had received no consideration for his
cooperation with prosecutors. We have already addressed this issue
above. See supra at 35-38. Correy also cites Agent Stoothoff's
assertion, during his direct testimony as a defense witness, that
he saw an American Airlines flight manifest that indicated that
Correy and others flew to Puerto Rico immediately prior to the
Blanco and de Jesús murders. (TT 10/28/99: 64-67). The
government, however, was no longer in possession of the manifest,
and Correy asserts that the manifest would have been destroyed
according to the airline's document retention procedures long
before Agent Stoothoff claims he obtained it. Correy has not shown
that Stoothoff lied about seeing the manifest, however, and even if
he had, the testimony was stricken and the jury was instructed to
disregard it as violative of Federal Rule of Evidence 1003. (TT
10/28/99: 131-32, 136).
         Correy alleges two other instances of perjury or
prosecutorial misconduct. The first is Agent Stoothoff's incorrect
assertion that another investigator, who later testified to the
contrary (TT 11/23/99: 31), told him a dive team had searched for
evidence of the Blanco and de Jesús murders. The second is
cooperating witness Vélez's testimony that Correy participated in
a drug transaction despite his failure, when debriefed by
investigators, to mention Correy's participation and Martínez's
conflicting testimony that Correy was not present for that
particular transaction. Neither instance demonstrates perjury or
prosecutorial misconduct.
[T]he government is not forbidden to call
witnesses whose reliability in one or many
particulars is imperfect or even suspect. Its
obligations are to make a clean breast of any
evidence it has which may contradict such
witnesses or undermine their credibility, and
not to rest its case upon testimony which it
believes to be incorrect.

McGovern, 499 F.2d at 1143; See generally Lebon, 4 F.3d at 2
("[T]he fact that a witness contradicts herself or changes her
story does not establish perjury."); Doherty, 867 F.2d at 70
(finding no decision that "prohibits a prosecutor from calling
witnesses who will present conflicting stories").
                e. Preservation of evidence
         Bonilla argues that he was prejudiced by the
government's

 failure to preserve evidence -- bullet casings and
a bloody shirt -- taken from the scene of the Blanco and de Jesús
murders. Bonilla was not charged in the murder counts, but argues
that the evidence might have helped to impeach the credibility of
Pérez by showing that Martínez's account of the murders was true
and Pérez had lied about his involvement. Bonilla's position
relies on the speculative reasoning that the bullet casings might
have been traceable to Pérez's weapon, or that Pérez's DNA might
have been found on the shirt, thereby demonstrating that Pérez lied
about not shooting the victims. Neither of these outcomes appears
likely from Martínez's account, which was that Correy and Nicolai
used weapons provided by Pizarro to shoot the victims inside a
rental car and then Nicolai used a t-shirt to wipe fingerprints
from the interior. (TT 9/21/99: 85-95). Moreover, Pérez's
credibility had already been called into serious question by the
discrepancy between his and Martínez's accounts of the murders. 
Accordingly, we find that Bonilla was not prejudiced by the
apparently inadvertent loss of the casings and shirt.
         Bonilla also claims prejudice from the government's
failure to maintain an electronic organizer in operating condition,
resulting in the admission instead of an investigator's partial
transcription of its contents. The claim is without merit. The
organizer was nonfunctional because its batteries were dead, and
rather than risk losing data by changing the batteries,
investigators transcribed its contents before it lost power. The
district court considered and overruled objections to admitting the
transcribed information, holding that there was no evidence of
intentional tampering and that the incomplete record of the
contents was a topic appropriate for cross-examination. (TT
5/21/99: 67). We find no abuse of discretion in the ruling, nor
prosecutorial misconduct in the use of the transcription.
                f. Inappropriate gestures
         Correy claims that the prosecution attempted to influence
witnesses and the jury by making inappropriate gestures in open
court. Correy points to three instances in particular. On
June 14, the prosecution objected to Nicolai's (who was conducting
a cross-examination pro se) allegedly turning and making a face at
the prosecution table when he received a favorable ruling. In the
resulting sidebar, Nicolai and others on the defense alleged that
the prosecutors had also been gesturing, nodding or otherwise
showing satisfaction with favorable testimony and attempting,
through rapid-fire objections, to throw Nicolai off. The court
admonished all parties to behave. (TT 6/14/99: 23-29). On
September 1, the defense objected that a law enforcement officer
seated at the prosecution table was blatantly "coaching" Pérez as
he testified, through gestures. The trial judge witnessed some of
these gestures, and, though she did not conclude whether they were
voluntary or inadvertent, admonished the officer to stop making any
gestures that could be interpreted by the witness as direction. 
(TT 9/1/99: 65-73). During the sidebar discussion of this
incident, Nicolai and others on the defense again suggested that
AUSA Fernández was attempting to throw Nicolai off by, for example,
tapping his pen loudly. The court once again admonished all
counsel to behave appropriately. (TT 9/1/99: 65-73). Finally, on
October 26, the defense raised concerns that the behavior of the
prosecutor demonstrated a lack of respect for the court's authority
and might lead the jury to conclude that the government attorneys
enjoyed more latitude than defense counsel. The judge was aware of
two such instances, one in which she had to admonish the prosecutor
to abide by an evidentiary ruling, and another in which the
prosecutor threw his pen after receiving an adverse ruling. She
admonished him to keep his behavior in check and to respect the
court's authority. (TT 10/26/99: 175-77).
         The trial judge was in a far better position than we to
determine whether the alleged gestures and other behavior occurred,
whether they appeared to be intentional or inadvertent, and whether
they had any influence on witnesses or the jury. We will not
second-guess her rulings on the record before us. With regard to
those gestures that the court did observe -- nodding at the
witnesses, disregarding a ruling, and throwing a pen -- whether
they were intentional or not, they were unprofessional and
inappropriate. However, they occurred in the context of a seven-month jury trial, were addressed by admonishments from the court,
and, from the record, do not appear to have prejudiced Correy or
the other defendants. Within the overall framework of this lengthy
trial, they were unlikely to have affected the outcome of trial. 
Thus, they fall short of rendering the trial so unfair as to
require a new one.
         In sum, we find that none of the alleged instances of
prosecutorial misconduct was likely to have affected the outcome of
the trial, and thus none requires a new trial. To be sure,
"[i]ndividual errors, insufficient in themselves to necessitate a
new trial, may in the aggregate have a more debilitating effect." 
United States v. Sepúlveda, 15 F.3d 1161, 1195-96 (1st Cir. 1993). 
The prosecution's initial failure to disclose the unwritten
cooperation agreement it created with Martínez-Medina, along with
the less disconcerting but still inappropriate violation of Pérez's
sequestration order and the government's courtroom behavior all
reflect poorly on the conduct of the prosecution. However, when
viewed "against the background of the case as a whole," id. at 1196
-- a seven-month trial of ten defendants on charges stemming from
a large and lengthy drug-trafficking conspiracy, during which the
trial judge diligently addressed and effectively corrected for
errors as they were brought to her attention -- the fairness of the
trial was not compromised.
         Finally, we note that although "[w]hen confronted with
extreme misconduct and prejudice" we may "invoke [our] supervisory
powers to remedy the violation of a recognized right, preserve
judicial integrity, and deter illegal conduct" by ordering a new
trial, we cannot do so "[w]ithout a nexus between improper
prosecutorial practice and prejudice to the defendant." United
States v. Osorio, 929 F.2d 753, 763 (1st Cir. 1991); see also Bank
of Nova Scotia v. United States, 487 U.S. 250, 254-55 (1988). We
cannot therefore consider action to penalize the tactics employed
in this case because appellants were not prejudiced by the
prosecutor's actions.
         4. Juror misconduct
         During a trial recess, a court officer heard one of the
jurors say that she was jealous and heard another juror explain
that it was because Nicolai's wife was in the courtroom.

 The
trial judge decided, over the objection of appellants, to further
investigate the matter by interviewing the juror in question. 
Although the juror initially denied the comment, she eventually
made a number of assertions that raised concerns about jury bias,
including that some female jurors "liked" certain defendants, that
she knew Nicolai was in jail, and that jurors had expressed the
opinion that Nicolai was a "cabesilla [sic]"

 (kingpin) of a gang. 
Her responses also suggested that the jurors might prematurely have
begun deliberating about the trial by discussing the evidence
presented and whether certain defendants should be convicted.
         Following the interview, several defendants moved for a
mistrial. The court denied that motion, opting instead to voir
dire each member of the jury individually to determine whether any
of them had formed an opinion or was improperly affected by the
statements of the first juror. Based on the voir dire, the court
excused the first juror along with another juror who indicated that
she had already made a decision about three of the defendants. The
court also denied defendants' renewed motion for a mistrial and to
strike additional jurors. Appellants Nicolai and Pizarro argue
that the court erred in declining to declare a mistrial or to
strike other jurors, largely because a number of jurors allegedly
displayed a "lack of candor" when questioned and one juror
demonstrated a lack of English proficiency.
         "When a non-frivolous suggestion is made that a jury may
be biased or tainted by some incident, the district court must
undertake an adequate inquiry to determine whether the alleged
incident occurred and if so, whether it was prejudicial."

 United
States v. Gastón-Brito, 64 F.3d 11, 12 (1st Cir. 1995) (internal
quotation marks omitted). "[T]he district court maintains
significant discretion in determining the type of investigation
required by a juror misconduct claim," which "is at its broadest
when determining how to deal with an allegation of premature jury
deliberations." United States v. Mikutowicz, 365 F.3d 65, 74 (1st
Cir. 2004). We review the district court's actions for abuse of
that discretion. Id.
         After lengthy interviews with each juror, during which
the prosecution and defense counsel were also permitted to ask
questions, the trial judge stated that "the Court finds, and I am
convinced, that the fairness of the trial is not in jeopardy,
. . . [and that o]n the matter of lack of candor of the jurors, I
did not perceive that from any of the jurors who came before us." 
(TT 8/20/99: 138). The two jurors whom the trial judge deemed to
be biased were dismissed, and the remaining jurors were instructed
again that they were not to draw conclusions about the facts of the
case until the trial ended. (TT 8/23/99: 5-6). Having reviewed
the voir dire transcript, we can find no abuse of discretion in the
corrective measures adopted by the district court. Nor did the
court abuse its discretion in refusing to instruct each juror not
to discuss his or her interviews with the rest of the jury.

         Appellants also argue that one of the jurors ought to
have been discharged because she demonstrated a lack of reasonable
English proficiency. The juror was questioned and gave responses
in English both at jury selection and when interviewed about
potential jury misconduct on August 20, 1999. On both occasions,
defense counsel was present, but no objection was made. Under such
circumstances, our cases require a showing of "'manifest' or
'clear' injustice." United States v. Nickens, 955 F.2d 112, 117
(1st Cir. 1992) (quoting United States v. Cepeda Penes, 577 F.2d
754, 759 (1st Cir. 1978)); Thornburg v. United States, 574 F.2d 33,
36 n.5 (1st Cir. 1978). Here, the Nickens case is controlling,
since we determined that:
where the juror[], individually, [was]
required to speak some English in the presence
of defendant and counsel at the voir dire,
where counsel thereafter raised no objection
and sought no further inquiry, and where the
record itself does not compel the conclusion
that the juror[] [was] necessarily
incompetent, there was no clear or manifest
injustice in [her] service.

Nickens, 955 F.2d at 118. Indeed, in the instant case, appellants
had two opportunities to evaluate the juror's English and to
request additional inquiry into her proficiency, but "[t]he
opportunity to make . . . further evaluation was irretrievably lost
by the failure to object." Id. at 117. None of the circumstances
offered by appellants -- that the juror indicated that her English
was "not good," and that she twice requested clarification of a
question about whether the jury had an open mind about the case

-– compel the conclusion that she was incompetent. Accordingly,
appellants have not made the requisite showing for relief.
         5. Evidentiary arguments
                a. Evidence of killings
         Counts Five and Six of the superceding indictment charged
Correy and Nicolai with killing Blanco and de Jesús while engaged
in an offense punishable under 21 U.S.C. §§ 841(b)(1)(A), 846 (the
drug trafficking conspiracy charged in Count One), in violation of
21 U.S.C. § 848(e). Accordingly, evidence concerning the killings
was offered at trial. Appellants Flores and Bonilla argue that the
killings in question were not related to the drug trafficking
conspiracy charged in Count One, but rather resulted from a
separate conspiracy between Correy, Nicolai, and others. 
Accordingly, they argue, the trial court erred in admitting
evidence about the killings. Although neither Flores nor Bonilla
was charged in Counts Five or Six, they claim they were prejudiced
by the spillover effects of that evidence.
         During the direct examination of Pérez, counsel for
Bonilla sought to exclude evidence of the killings on the basis
that they were not part of the charged conspiracy. (TT 5/26/99:
17-18). After extensive argument (TT 5/26/99: 47-77) and in camera
review of portions of Pérez's and Martínez's grand jury testimony,
the district court issued an order overruling the objection. 
(Docket No. 1276). The court found that the killings were
sufficiently related to the conspiracy charged in Count One, in
part because of Martínez's testimony that Pérez wanted the killings
to occur because he suspected Blanco of stealing drugs in transit. 
(Docket No. 1276). We can find no abuse of discretion in that
determination. See United States v. Mercado Irizarry, 404 F.3d
497, 500 (1st Cir. 2005) (evidentiary rulings reviewed for abuse of
discretion).
         Moreover, appellants have failed to show prejudice from
the spillover effects of the testimony in question. The court took
adequate measures to guard against spillover prejudice by
instructing the jury to consider each charged offense, and any
evidence relating to it, separately as to each defendant. (TT
12/13/99: 118). United States v. Bailey, 405 F.3d 102, 112 (1st
Cir. 2005); United States v. Houle, 237 F.3d 71, 76 (1st Cir.
2001). "We presume that jurors follow such instructions," and the
fact that defendants were acquitted on Counts Four, Five and Six
"is strong evidence that the jury successfully compartmentalized
the evidence and applied the appropriate evidence to the
appropriate counts and defendants." Bailey, 405 F.3d at 112. 
Moreover, Correy's and Nicolai's acquittal on the murder charges
suggests that evidence of the killings was not credited or applied 
against those directly charged in Counts Five and Six. It would be
difficult, therefore, to imagine how the same evidence could have
prejudiced appellants with respect to Count One. Accordingly,
Flores' and Bonilla's appeal on this evidentiary claim fails.
                b. Overview testimony
         Flores argues, based on our holding in the appeal of four
defendants who were tried separately on the same indictment, United
States v. Casas, 356 F.3d 104, 117-24 (1st Cir. 2004), that the
trial court erred in admitting improper preliminary "overview"
testimony from Agent Stoothoff. In Casas, we made clear that the
practice of having a government agent testify broadly to summarize
facts not yet (or, as in Casas, never to be) in evidence in an
effort to "paint a picture of guilt before the evidence has been
introduced," id. at 119 (quoting United States v. Griffin, 324 F.3d
330, 349 (5th Cir. 2003)), is "inherently problematic," id.
         Three points at which Agent Stoothoff testified about the
existence and operation of a drug smuggling organization involving
the defendants are cause for concern. First, in describing his
investigation immediately after the airport arrests, Agent
Stoothoff reported that he "tried to identify other co-conspirators
that had anything to do with the 81 kilograms of cocaine . . .
[and] tried to substantiate what our cooperator at the time . . .
had told us about previous trips which he had made for the
organization carrying cocaine." (TT 5/18/99: 71). This response
assumes the existence of a drug conspiracy or organization about
which no facts had yet been offered into evidence. No objection,
however, was made by the defense. More disconcerting is Agent
Stoothoff's later description of the operations of the alleged
organization, in response to a general question about the results
of his investigation:
A. Our investigation revealed that this
organization had --
 
MR. MASINI: Objection.
 
MS. TREVIÑO: "The organization."
 
THE WITNESS: Our investigation revealed that
this group of people that we identified had
previously moved cocaine through the airport
in Carolina, Puerto Rico, and continued to
move cocaine through Puerto Rico and other
entry points such as Miami, up to New York,
after --

Objections from two defense attorneys to lack of foundation
followed, but were overruled. That ruling was erroneous, as it
does not appear from the record that Agent Stoothoff had personal
knowledge of the group's activities outside of the incident at the 
Carolina airport on March 21, 1994.
         Later during the direct examination, Agent Stoothoff
discussed the information he obtained from Pérez about the
operations of the drug conspiracy. At first, his testimony was
limited to a description of what Pérez told him, but he soon began
to directly state the information apparently provided by Pérez, as
a matter of fact:
THE WITNESS: [Pérez] advised us what the jobs
of the actual participants and the co-conspirators were in his organization. He
provided us with general dates of loads of
cocaine which were transported from Puerto
Rico or Dominican Republic to New York,
sometimes via Miami.
 
Q: How large were you able to determine the
drug trafficking organization was [sic]?
 
A: The drug trafficking organization
encompassed in excess of 60 people.
 
Q: What were you able to determine about the
roles of in excess of 60 people that were
identified to you?

(TT 5/18/99: 80-81). After an objection from the defense to lack
of foundation was overruled, Agent Stoothoff proceeded to describe
the activities -- such as accompanying drug shipments and
laundering proceeds from the sale of drugs -- of various
individuals whom he stated he had identified, although he did not
provide their names. This line of testimony appears to have been
based, at least in part, on information provided by Pérez. Cf.
Casas, 356 F.3d at 118.
         Here, as in the earlier severed trial, Agent Stoothoff
"went well beyond his personal knowledge based on the airport
incident and the search," and "did not differentiate the testimony
that was based on personal knowledge from other sources of
information." Id. at 118-19. Although he did not this time go so
far as to "essentially testif[y] that each of the defendants was
guilty of the conspiracy charged," id. at 119, the comments
described above are nonetheless improper. The admission of this
testimony, however, is harmless as to Flores if the government can
show that "it is highly probable that the error did not influence
the verdict." Id. at 121.
         Flores was convicted on the only count for which he was
charged -- Count 1, which alleged conspiracy to possess with intent
to distribute heroin and cocaine. In particular, Flores was
accused of receiving thirty kilograms of cocaine at the Luis Muñoz
Marín International Airport in Carolina, Puerto Rico, and smuggling
them past security. Three cooperating witnesses -- Pérez, Vélez,
and Martínez-Medina -- testified that an individual named "Ratón,"
who worked as a janitor at the airport, would receive carry-on bags
containing cocaine at a bar on the unsecured side of the terminal
and carry them past security, delivering them to members of the
organization at a restaurant on the secure side of the terminal.

 
Two of these witnesses, Pérez and Martínez-Medina, identified
Flores by sight as Ratón (TT 5/25/99: 29-30; TT 8/19/99: 77-78),
and Martínez-Medina recalled that Ratón's real name was Raymond or
Ramón (TT 8/19/99: 78).
         Although, as Flores points out, the trial testimony about
Ratón's appearance was not entirely consistent,

 Agent Stoothoff
never identified Flores by name or appearance, and so any improper
testimony he gave could not have increased the jury's likelihood of
concluding that Flores was, indeed, the person described as Ratón. 
Although Agent Stoothoff did impermissibly describe the existence
of a conspiracy, there was more than ample evidence of the same
fact from other sources for the jury to convict. Accordingly, no
prejudice resulted from the court's improper admission of Agent
Stoothoff's overview testimony.
         6. Court Reporter Act
         Bonilla argues that the district court erred in allowing
the court reporter to read back requested portions of trial
testimony in the jury room, without recording the read back. We
need not consider the issue, however, because the trial record
reflects that no such read back actually occurred, the jury having
determined that it did not wish to hear the requested testimony
after all. (TT 12/14/99: 14).
         7. Newly discovered evidence
         Pizarro and Nicolai argue that the district court erred
in denying Nicolai's motion

 for a new trial on the basis of newly
discovered evidence that Pérez continued to be involved in drug-trafficking activities during appellants' trial. (Docket Nos.
2272, 2315). On February 16, 2001, Pérez was indicted on drug
conspiracy charges in the United States District Court for the
Southern District of Florida. United States v. Bido, No. 01-139
(S.D. Fla. Feb. 16, 2001). The period of the charged conspiracy
was from August 17, 1999 to February 2, 2001. Pérez's testimony in
the instant case concluded in early July 1999. On May 13, 2002,
Nicolai moved for a new trial in part on the basis of this newly
discovered evidence, which, he argued, would have served to further
impeach the credibility of Pérez's testimony. The motion also
alleged prosecutorial misconduct for failure to notify the defense
of Pérez's ongoing criminal activity and knowingly allowing Pérez
to commit perjury while testifying in the instant case. In the
alternative to a new trial, Nicolai sought additional discovery and
an evidentiary hearing on the claims. (Docket No. 2272). The
district court

 denied the motion, a ruling which we review for
abuse of discretion. United States v. Colón-Muñoz, 318 F.3d 348,
357-58 (1st Cir. 2003) (motion for a new trial and evidentiary
hearing).
         To prevail on a motion for a new trial under Federal Rule
of Criminal Procedure 33 on the basis of newly discovered evidence,
the movant must show that "(1) the evidence was unknown or
unavailable to the defendant at the time of trial; (2) failure to
learn of the evidence was not due to lack of diligence by the
defendant; (3) the evidence is material, and not merely cumulative
or impeaching; and (4) it will probably result in an acquittal upon
retrial of defendant." Id. at 358 (internal quotation marks
omitted). To satisfy the fourth prong, if the evidence has only
recently come to the attention of defendant because of a Brady
violation or the government's knowing use of perjured testimony,
the defendant must show a "reasonable probability" or "reasonable
likelihood" that its timely disclosure would have altered the trial
result. United States v. González-González, 258 F.3d 16, 20-22
(1st Cir. 2001). At issue is "whether defendants received a fair
trial resulting in a verdict worthy of confidence." Id. at 22. In
the absence of a Brady violation, or when perjured testimony has
been used unwittingly, the defendant must meet the more onerous
standard of showing an "'actual probability that an acquittal would
have resulted if the evidence had been available.'" Id. at 20-21
(quoting Sepúlveda, 15 F.3d at 1220).
         The district court held that the evidence in question was
not material, insofar as (1) it dealt with activities that occurred
after Pérez's testimony concluded, and thus would not have been
useful for impeachment purposes, and (2) even if it could have been
used to impeach Pérez's credibility, it would have been cumulative
because Pérez's credibility was already dubious and he had admitted
to extensive involvement in the criminal activities that formed the
basis of the instant indictment. Moreover, the court held, even if
the information satisfied the third prong for a Rule 33 motion, the
fourth prong was not met because there was strong evidence, even in
the absence of Pérez's testimony, of Nicolai's involvement in the
conspiracy charged in Count 1, for which he was convicted.

 We
agree with these findings and find no abuse of discretion in the
district court's denial of the motion for a new trial on the basis
of Pérez's ongoing criminal activity. (Docket No. 2315).
         The district court also found no evidence of
prosecutorial misconduct, noting that the prosecution could not
have improperly withheld evidence that it did not yet possess, and
that there was no evidence it knowingly permitted Pérez to perjure
himself by failing to admit to his ongoing criminal activities. 
The Florida indictment was not issued until after the conclusion of
appellants' trial, and, despite the affidavit of an FBI agent in
which Pérez's criminal activities as early as August 17, 1999 are
discussed, it was not readily apparent that the government had
information about these activities prior to the conclusion of the
trial. (Docket No. 2315).
         Absent another basis for the denial of a new trial for
prosecutorial misconduct, we might agree with appellants that their
motion for further discovery and an evidentiary hearing should have
been granted in order to determine what, if anything, the
government knew about Pérez's ongoing criminal activities during
trial. However, the district court reviewed the applicable Manning
factors and determined that even if prosecutorial misconduct had
occurred via nondisclosure, it did not render the trial unfair
because the remaining evidence against Nicolai was so strong that
the jury's verdict would not have been altered. We agree and find
that the evidence was similarly strong against Pizarro. (Docket
No. 2315). Accordingly, the district court did not abuse its
discretion when it denied additional discovery and an evidentiary
hearing on the basis that Nicolai's claim was "conclusively refuted
as to the alleged facts by the files and records of the case," 
United States v. Carbone, 880 F.2d 1500, 1502 (1st Cir. 1989)
(internal quotation marks omitted), because Nicolai had failed to
show that the new evidence undermined the jury's verdict, given the
ample evidence against him.
B. Sentencing
         On April 8, 2002, in response to a backlog of cases on
Judge Cerezo's docket, the Judicial Council of the First Circuit
entered an order directing a three-judge committee of the District
of Puerto Rico to review long-pending criminal and civil cases and
to remove those deemed, by a majority vote of that committee, to be
likely to be expedited by reassignment. See Fed. R. Crim. P. 25(b)
(permitting replacement of trial judge who becomes unable to
perform duties after a guilty verdict); Colón-Muñoz, 318 F.3d at
354-55 (holding that inability due to substantial delay falls
within Fed. R. Crim. P. 25(b)). On April 12, 2002, that committee
ordered thirty-five cases, including the one now on appeal,
randomly reassigned.

 (attached to Docket No. 2250).
         On April 24 and 25, 2002, the successor judge set
sentencing for each appellant for early May. Nicolai, joined by
the other appellants, moved to have the case reassigned to the
trial judge for sentencing because of her familiarity with the
case. (Docket Nos. 2211, 2219, 2220, 2222, 2225, 2227). Casas
filed a separate motion requesting transfer, noting in particular
that the trial judge had already made rulings affecting sentencing
when she ordered the Probation Office to calculate the drug
quantities attributable to each defendant on the basis of the trial
evidence (Docket No. 1856) -- a calculation that had not yet been
added to his PSR –- and when she ordered the compilation of
evidence pertaining to the sentencing of Pérez and Martínez, for
purposes of conducting an inquiry into the issue of prosecutorial
misconduct. (Docket Nos. 1624, 2233). On May 7, 2002, the
successor judge denied the motions to transfer the case back to the
trial judge and stated that he had "familiarized himself with this
case and [had] reviewed the transcripts and pleadings which pertain
to these defendants." (Docket No. 2250).
         Because the indictment had not assigned specific drug
quantities to each defendant, nor had the jury issued special
verdicts attributing drug quantities to the individual defendants,
the district court made individual quantity determinations based on
its review of the record. The district court relied heavily on the
testimony of Martínez on September 21, 1999 in calculating the drug
quantities attributable to each defendant.
         Correy was found responsible for over 150 kilograms of
cocaine, resulting in a base offense level ("BOL") of 38. The
sentencing judge added a two-level enhancement for possession of a
weapon under U.S.S.G. § 2D1.1, for a total offense level ("TOL") of
40, and on the basis of the TOL and a Criminal History Category
("CHC") of VI, sentenced Correy to 480 months imprisonment, out of
a Guidelines range of 360 months to life. Casas, who had a CHC of
I, was also found responsible for over 150 kilograms of cocaine,
for a BOL of 38. He was sentenced to the bottom end of the 235 to
293 month Guidelines range. Bonilla also had a CHC of I and was
found responsible for over 150 kilograms of cocaine. The court
declined to add a weapons enhancement, sentencing Bonilla to the
lower end of the Guidelines range at 235 months. Pizarro was held
accountable for more than 150 kilograms of cocaine, along with a
two-level enhancement for weapon possession and a three-level role
enhancement, for a TOL of 43. Combined with a CHC of II, the
Guidelines mandated a life sentence. Flores received a sentence
based on a BOL of 38, representing 150 kilograms or more of
cocaine, and a two-level enhancement for abuse of a position of
trust. Combined with a CHC of I, the applicable Guidelines range
was 292 to 365 months. Flores was sentenced to the bottom of that
range, 292 months. Finally, Nicolai was found responsible for over
150 kilograms of cocaine, and received a two-level weapon
enhancement and a four-level role enhancement, for a TOL of 43
combined with a CHC of IV. The Guidelines accordingly mandated a
life sentence.
         Appellants raised a number of objections to sentencing
and now appeal on those bases before this court. We deal with the
various objections in turn.
         1. Reassignment for sentencing
         Flores, Pizarro, and Nicolai argue that the committee
abused its discretion in reassigning this case, because the record
was so voluminous that it would not be possible for the successor
judge to adequately familiarize himself with the case.
         Fed. R. Crim. P. 25(b)(2) permits a successor judge to
order a new trial "if satisfied that . . . a judge other then the
one who presided at the trial cannot perform the post-trial
duties." We have interpreted this clause to indicate that a new
trial may be required if "a judge who inherits a case at the post-verdict stage [is] not . . . sufficiently familiar with the case to
sentence the defendants without conducting a new trial." United
States v. Casas, 356 F.3d 104, 128 (1st Cir. 2004); see also Colón-Muñoz, 318 F.3d at 356. Ordinarily, however, the successor judge
is "'capable of assessing the credibility of the witnesses and the
evidence at trial by a thorough review of the record.'" Colón-Muñoz, 318 F.3d at 355 (quoting United States v. Bourgeois, 950
F.2d 980, 988 (5th Cir. 1992)). The trial record in this case is
of daunting proportions, and we are all too aware that a thorough
review is a time-consuming process, but it is not so insurmountable
a task as to render the committee's decision to reassign the case
an abuse of discretion. There was no error in the committee's
reassignment of the instant case prior to sentencing.
         2. Sentencing judge's familiarity with record
         Appellants next argue that the sentencing judge abused
his discretion in refusing to return the case to the trial judge
and in proceeding with sentencing because he lacked sufficient
familiarity with the record. As we noted above, a replacement
judge is ordinarily "capable of assessing the credibility of the
witnesses and the evidence at trial by a thorough review of the
record." Id. Courts of Appeals "give great deference to the
district judge's decision to proceed with sentencing." United
States v. Larios, 640 F.2d 938, 942 (9th Cir. 1981); see also
United States v. McGuinness, 769 F.2d 695, 696 (11th Cir. 1985)
(stating that "[a] sentencing judge enjoys broad discretion to
determine whether he can perform sentencing duties in a case he did
not try").
         In the instant case, approximately one-third of the trial
days had not been transcribed at the time of sentencing and thus
were unavailable to the sentencing judge for review. This absence
of transcripts initially gives us pause, both because of the amount
of unavailable transcripts and because credibility was an important
issue in appellants' trial. However, after carefully reviewing the
record, our concern is lessened due to several factors.
         First, our review of the record reveals that, while most
of the appellants requested transcripts at one time or another 
(Docket Nos. 1644, 1645, 1647, 1736, 2143), the transcripts that
they requested were made available by the time of their
sentencing.

 Second, the original trial judge ordered only the
transcripts that she felt were relevant for sentencing the
appellants. (Docket No. 1715). These transcripts were available
to the successor sentencing judge. Third, the sentencing judge
repeatedly stated that he had reviewed the portions of the record
pertinent to defendants' sentencing and cited to specific passages
of the transcripts in determining the drug quantity attributable to
each defendant.
         The Ninth Circuit has stated that the scrutiny with which
the record must be examined by a successor judge "varies with the
facts of each case[;] the more the case depends on the credibility,
and especially the demeanor, of the witnesses, the more a judge
needs to do to become adequately familiar with it." Larios, 640
F.2d at 943. While we agree with Larios's proposition, we need not
analyze the merits of appellants' complaints on this issue further
because we are remanding their cases for re-sentencing -- at which
appellants and the sentencing judge will have access to all of the
transcripts -- due to Booker error and violations of Fed. R. Crim.
P. 32(e). See infra.

         3. Federal Rule of Criminal Procedure 32(e)

         Under the Federal Rules of Criminal Procedure, "[t]he
probation officer must give the presentence report to the
defendant, the defendant's attorney, and an attorney for the
government at least 35 days before sentencing unless the defendant
waives this minimum period." Fed. R. Crim. P. 32(e)(2).

 Bonilla
argues that, pursuant to an order from Judge Cerezo, the Probation
Office was required to prepare a revised PSR that contained
findings regarding the quantities and types of drugs attributable
to Bonilla. Bonilla never received a revised PSR prior to his
sentencing hearing. Before addressing this argument, we pause to
briefly provide background.
         Bonilla, along with the other appellants, was convicted
of Count I, conspiracy to possess with intent to distribute
approximately 1400 grams of heroin and 9445 kilograms of cocaine. 
We have consistently held that
when a district court determines drug quantity
for the purpose of sentencing a defendant
convicted of participating in a drug-trafficking conspiracy, the court is required
to make an individualized finding as to drug
amounts attributable to, or foreseeable by,
that defendant. In the absence of such an
individualized finding, the drug quantity
attributable to the conspiracy as a whole
cannot automatically be shifted to the
defendant.

United States v. Colón-Solís, 354 F.3d 101, 103 (1st Cir. 2004);
see also United States v. Sepúlveda, 15 F.3d 1161, 1197 (1st Cir.
1993). On July 11, 2000, Bonilla was scheduled for his sentencing
hearing before Judge Cerezo. At the hearing Judge Cerezo found
that the PSR contained no findings as to the quantities or types of
drugs attributable to Bonilla.

 In accordance with the principles
set out in Sepúlveda, Judge Cerezo vacated Bonilla's sentencing
hearing. She then instructed the U.S. Probation Officer
to utilize methods of calculation based on
these principles [in Sepúlveda] and on the
evidence presented at trial which is relevant
to Mr. Bonilla-Lugo. Since this case was a
lengthy trial, and compliance with this order
shall require the Officer to read voluminous
trial transcripts, as she/(he) must do as to
the other defendants waiting sentence, a term
of forty five (45) days is granted for the
U.S. Probation Officer to comply with this
order.

         A second sentencing hearing for Bonilla was held on 
May 10, 2002, before Judge Laffitte. However, neither Bonilla nor
his counsel had received the revised PSR which Judge Cerezo had
ordered.

 Bonilla's counsel apprised the sentencing judge of this
fact. The judge, who had received the updated PSR, allowed
Bonilla's counsel to read the supplement. After reading it,
Bonilla's counsel asked for more time, stating "I've read this
memorandum, and it's wrong, Your Honor, and I need time to prove
that, and I have it in the record. I can proof (sic) it from the
record."

 Specifically, Bonilla's counsel insisted that, if she
had more time, she could refute the quantity of drugs that the PSR
attributed to Bonilla. The sentencing judge refused to grant a
continuance and sentenced Bonilla to 235 months imprisonment.
         "We ordinarily review the district court's failure to
continue the sentencing hearing for abuse of discretion." United
States v. López-López, 295 F.3d 165, 169 (1st Cir. 2002). We
believe that, in this case, the district court abused its
discretion by not continuing the sentencing hearing. We explain
briefly.
         The Probation Office's failure to provide Bonilla with a
revised PSR was a violation of Rule 32(e). Judge Cerezo ordered
the Probation Office to revise the PSR to include information about
the quantities and types of drugs attributable to Bonilla. The
Probation Office prepared the revised PSR but failed to give it to
Bonilla or his counsel thirty-five days before sentencing. Bonilla
did not waive his right to notice; indeed, Bonilla's counsel
objected at the sentencing hearing and asked repeatedly for more
time.
         The government argues that any error was harmless because
Bonilla's counsel had access to the trial transcripts the district
court used in determining the drug quantities attributable to
Bonilla. We disagree. The time limits found in Rule 32(e) and its
predecessor "are no mere technicalities; they are integral to the
fair and orderly process of imposing sentence. They are mandatory
and we expect compliance with them." Id. Further, one reason for
a PSR is so that parties do not have to comb through voluminous
trial transcripts to anticipate remaining factual and legal issues. 
See United States v. Butler, 41 F.3d 1435, 1444 (11th Cir. 1995)
(stating that "the PSR facilitates the identification of factual
and legal issues that remain in dispute"). Bonilla was entitled to
receipt of the supplemental PSR thirty-five days before sentencing,
but did not receive it until his actual sentencing hearing. His
counsel objected, insisting that if she had more time, she could
prove from the record that certain testimony from Martínez, on
which the district court relied in determining the quantity of
drugs attributable to Bonilla, was contradicted elsewhere by
Martínez's own testimony. Given these facts, the complex nature of
this case, and the voluminous transcripts and testimony involved,
the government has not convinced us that the error was harmless. 
We therefore vacate Bonilla's sentence and remand for re-sentencing.
         4. Booker
         Sentencing in this case occurred after the Supreme
Court's decision in Apprendi v. United States, 530 U.S. 466 (2000),
but prior to its related decisions in Blakely v. Washington, 542
U.S. 296 (2004), and United States v. Booker, 125 S. Ct. 738
(2005). Booker, however, applies to cases pending on direct appeal
at the time of its decision, 125 S. Ct. at 769, and Booker error
did occur in this case insofar as the defendants were sentenced
under a mandatory Guidelines system. See United States v.
Antonakopoulos, 399 F.3d 68, 76 (1st Cir. 2005). All appellants
except for Bonilla seek remand on the basis of Booker error,
although not all have preserved the error.
                a. Preserved Booker error
         "This court deems Booker error preserved if the defendant
argued at sentencing that the sentence violated Apprendi or
Blakely, or that the federal Sentencing Guidelines were
unconstitutional." United States v. Gómez-Rosario, 418 F.3d 90,
109 (1st Cir. 2005) (citing Antonakopoulous, 399 F.3d at 76). 
"Where a defendant has preserved a Booker claim, we review for
harmless error, remanding for re-sentencing unless the government
can show beyond a reasonable doubt that a lower sentence would not
be imposed under the post-Booker regime." Id. (citing United
States v. Vázquez-Rivera, 407 F.3d 476, 489 (1st Cir. 2005)). 
Three of the appellants, Nicolai, Pizarro and Flores, have
preserved Booker claims.
         Nicolai asserted an Apprendi error at his sentencing,
arguing that the jury failed to specify the type and quantity of
drugs for which he was convicted. The government concedes that
Nicolai preserved a Booker claim and also concedes that it cannot
prove harmless error. We agree and remand his case for re-sentencing.
         The government also concedes that Pizarro preserved a
Booker claim. At his sentencing, Pizarro objected that the jury
did not make a finding on the issue of drug quantity. When the
district judge asserted that there was no Apprendi issue, Pizarro's
counsel responded that "[w]e believe, Your Honor, that there is
room in that respect." We agree with the government that Pizarro
preserved a Booker claim.

 As with Nicolai, the government also
concedes that it cannot prove harmless error, and, as with Nicolai,
we agree. Thus, we also remand Pizarro's case for re-sentencing.
         The government does not concede that Flores preserved a
Booker error. However, we see no distinction between what occurred
at Flores's sentencing and what occurred at Pizarro's. At his
sentencing, Flores objected that "the jury didn't render any sort
of special verdict concerning the amounts [of drugs] that were
attributable [to Flores]." The district court asserted that "there
is no Apprendi issue," to which Flores replied "we do not concede
that." Flores made the same argument that Pizarro made at his
sentencing: that because the jury did not make a finding as to drug
quantity he could not be sentenced above the default statutory
maximum based on findings made by the judge.

 As with Pizarro, the
district judge understood the argument as an Apprendi argument and
replied that there were no Apprendi issue. Also as with Pizarro,
Flores expressed a belief that there was an Apprendi issue when he
stated that he did not concede Apprendi. As we have stated, we
have "offered to treat almost any colorable claim in the district
court as preserving the Booker issue," United States v. Heldeman,
402 F.3d 220, 224 (1st Cir. 2005), and we believe that Flores has
preserved a Booker claim.
         We must now address whether any error was harmless, i.e.,
whether the government has convinced us "that a lower sentence
would not have been imposed had the Guidelines been advisory." 
Vázquez-Rivera, 407 F.3d at 489. We have characterized this
standard as "extremely difficult, but not impossible . . . to
meet." Id. at 489-90. Further, we have remanded for re-sentencing
where "the government has pointed to no statement or action of the
sentencing judge that would assure us that he would have imposed
the same sentence in the absence of mandatory Guidelines." Id. at
490.
         A review of the transcript of Flores's sentencing reveals
that the sentencing judge stated that "I cannot depart . . . [a]nd
even if I had the discretion to depart, I wouldn't depart." 
However, upon a closer reading, it is evident that the sentencing
judge was speaking only about departures for prosecutorial
misconduct. There could very well be other reasons the district
court would have departed under discretionary guidelines. We note
that Flores has argued that his sentence was enhanced above the
maximum sentence authorized by jury fact-finding or admitted facts,
and that, in such a situation, a judge's "'factual certainty alone'
in support of such enhancements 'would not be sufficient to show
beyond a reasonable doubt that the judge, acting under an advisory
Guidelines system, would have applied the same sentence on the
basis of those factors.'" United States v. Fornia-Castillo, 408
F.3d 52, 73-74 (1st Cir. 2005) (quoting Vázquez-Rivera, 407 F.3d at
489-90).
         Further, the district judge sentenced Flores at the low
end of the guideline range, rejecting the government's request for
a sentence at the upper-end of the guideline range. See Vázquez-Rivera, 407 F.3d at 490 (stating that "our doubt . . . is enhanced
by the fact that, while the applicable Guidelines constrained the
sentencing judge to the upper margin of sentences available under
[the relevant statute], the sentence he chose was at the low end of
that margin"). On the balance, we are not convinced beyond a
reasonable doubt that Flores would not have received a lower
sentence had the Guidelines been advisory. We therefore remand
Flores's case for re-sentencing.
                b. Unpreserved Booker error
         The remaining two defendants,

 Casas and Correy, have not
preserved a Booker claim. Casas argues that he preserved a Booker
claim because he objected to the computation of the drug amounts
attributable to him and because the district court stated that it
had "to do an Apprendi verdict." However, unlike the defendants
who preserved Booker claims, Casas never actually argued Apprendi. 
While the district court mentioned Apprendi, it did so in an off-hand manner while responding to Casas's arguments regarding
sentence disparity. Casas therefore has not preserved a Booker
claim. See United States v. Martins, 413 F.3d 139, 153 (1st Cir.
2005) (stating that a defendant may not "piggyback upon the court's
off-hand comment [about Apprendi] . . . and use it as a means of
'preserving' his claim of Booker error"). Correy argues that he
preserved a Booker claim because he alerted the court in a pro se
motion that he had asked his counsel to object to his original PSR
on Apprendi grounds, but that his counsel never made the objection. 
We are doubtful that this is sufficient to preserve Correy's Booker
claim, as parties are generally bound by the acts of their lawyers. 
See Chestnut v. City of Lowell, 305 F.3d 18, 26 (1st Cir. 2002). 
Further, although Correy filed his pro se motion before sentencing,
indicating that he believed he had an Apprendi argument, neither he
nor his counsel mentioned Apprendi at the sentencing hearing. 
Because, as we discuss below, we find plain error, we will merely
assume, without deciding, that Correy failed to preserve a Booker
claim.
         We review unpreserved Booker claims for plain error. 
Antonakopoulos, 399 F.3d at 75. Defendants must satisfy a four-prong test: (1) that there was an error, (2) that it was plain, (3)
that it affected substantial rights, and (4) that the error
seriously impaired the fairness, integrity, or public reputation of
the judicial proceedings. United States v. Olano, 507 U.S. 725,
732 (1993). The first two prongs are met whenever a district court
treats the Guidelines as mandatory when imposing a defendant's
sentence. See Antonakopoulos, 399 F.3d at 75. To meet the other
two prongs, defendants must ordinarily show "a reasonable
probability that the district court would impose a different
sentence [that is] more favorable to the defendant under the new
'advisory Guidelines' Booker regime." Id. In Antonakopoulos, we
stated that a procedural error in the application of the Guidelines
that would have led us to remand a case for re-sentencing pre-Booker would likely provide a basis for remanding unpreserved
Booker claims. Id. at 81. We find that such an error occurred
regarding both Casas and Correy in that, like Bonilla, Fed. R.
Crim. P. 32(e) was violated in connection with their sentencing.
                     i. Casas
          As we noted in our discussion of Fed. R. Crim. P. 32 and
Bonilla, Judge Cerezo vacated Bonilla's original sentencing hearing
because the PSR contained no findings as to the quantities or types
of drugs attributable to Bonilla. Judge Cerezo also issued an
order instructing the Probation Office
to utilize methods of calculation based on
these principles [in Sepúlveda] and on the
evidence presented at trial which is relevant
to Mr. Bonilla-Lugo. Since this case was a
lengthy trial, and compliance with this order
shall require the Officer to read voluminous
trial transcripts, as she/(he) must do as to
the other defendants waiting sentence, a term
of forty five (45) days is granted for the
U.S. Probation Officer to comply with this
order.

(emphasis added). On May 1, 2002, Casas requested that his
sentencing hearing, scheduled for May 7, 2002, be continued until
he received a revised updated PSR containing findings of the
quantities or types of drugs attributable to him.
         At his sentencing, Casas again requested a continuance. 
He stated that he had understood Judge Cerezo's order to apply to
all the defendants and thought that his PSR "would be amended to
show the [drug] calculations as to specific amounts." [2359,
5/7/02, p. 4, l. 5-6]. Casas then protested that he had never
received the revised PSR. The Probation Officer stated that she
had applied Judge Cerezo's order only to Bonilla and therefore did
not prepare a revised PSR for anyone but Bonilla. After reading
the order, the sentencing judge concluded that it applied only to
Bonilla. The government then explained what evidence it relied
upon regarding the quantity of drugs it believed were attributable
to Casas. This explanation was based on information from the
government's response to Casas's motion for a continuance. Casas,
however, had not received the government's response, which had been
put in the mail on May 3, 2002, two business days before the May 7
sentencing hearing. Casas's counsel objected to the evidence used
by the government, arguing that he should have an opportunity to
address the government's evidence with specificity. The sentencing
judge initially denied this objection and began to discuss trial
transcripts regarding the quantities of drugs attributable to
Casas.

 However, after Casas's counsel strenuously objected, the
sentencing judge agreed to continue sentencing until 9:30 the
following morning. After Casas's counsel again vigorously
protested, the sentencing judge continued the sentencing hearing
for three days.
         On May 10, 2002, Casas again requested a continuance in
order to have time to dispute the evidence relied upon by the
government regarding the drug quantities attributable to Casas. 
This request was denied, and Casas was sentenced to 235 months
imprisonment.
         Casas now argues that he should be re-sentenced due to
the Probation Department's failure to provide him with an updated
PSR. This argument turns initially on whether Judge Cerezo's
July 11, 2000 order applied to all of the co-defendants, not just
Bonilla. We believe that it did. First, the language Judge Cerezo
used in her order indicates that it applied to all of the
defendants. The order stated that "compliance with this Order
shall require the Officer to read voluminous transcripts, as
she/(he) must do as to the other defendants awaiting sentence
. . . ."
         Second, consideration of the circumstances surrounding
the order bolsters our conclusion that it applied to all of the co-defendants. All of the co-defendants had been tried before Judge
Cerezo and convicted of the same count. A review of the original
PSRs of several of the co-defendants, including Casas, Bonilla and
Correy, reveals that they were all identical in that they did not
contain findings as to the quantities or types of drugs
attributable to the individual defendants.

 In other words, all
of the PSRs contained the same defect that caused Judge Cerezo to
vacate the sentencing hearing of Bonilla, who was the first of the
appellants scheduled for sentencing before Judge Cerezo.

 Further,
these PSRs had been submitted to Judge Cerezo prior to her order on
July 11, 2000. It is highly improbable that Judge Cerezo would
have ordered the Probation Office to revise Bonilla's PSR so that
it contained individualized drug quantities for Bonilla but did not
mean for the Probation Office to do the same for Bonilla's co-defendants who had been convicted of the same count and whose PSRs
contained the same defect.
         In light of the order's language and the surrounding
circumstances, we conclude that the order applied to all the
defendants. The Probation Office, which failed to deliver the
revised PSR to Bonilla, therefore also failed to prepare a revised
PSR for Casas. Like Bonilla, this is contrary to Rule 32(e)(2), in
that neither Casas nor his attorney received the updated PSR at
least thirty-five days prior to sentencing. See Fed. R. Crim. P.
32(e)(2).
         At oral argument, the government argued that any error
was harmless. We disagree, essentially for the same reasons that
we found the claimed error in Bonilla's case not to be harmless. 
We believe this to be true even considering the fact that Casas was
given a three-day continuance by the sentencing judge. In this
complex case, which involved a seven-month trial with trial
transcripts totaling over 8500 pages, we do not think that three
days was enough time for Casas to adequately challenge the
government's drug quantity calculations. Casas should have been
given the thirty-five days required by Rule 32(e) to review a
revised PSR.
         This violation of Rule 32(e) was a procedural error that
would have led us to remand for re-sentencing pre-Booker. See
Antonakopoulos, 399 F.3d 68. As we stated in Antonakopoulos, such
a procedural error will likely provide a basis for remanding
unpreserved Booker claims. Id. Given the violation of Rule 32(e),
we believe that there is a reasonable probability that the district
court will impose a more favorable sentence on remand. We base
this belief on the fact that, in addition to being sentenced under
advisory Guidelines, Casas will have adequate time to review the
trial transcripts in order to attempt to rebut the government's
claim as to the amount of drugs attributable to him. We therefore
remand Casas's case for re-sentencing. In doing so, we make no
"suggestion or . . . prediction that the sentence will necessarily
be altered." Heldeman, 402 F.3d at 224.
                     ii. Correy
         On May 16, 2000, Correy received a draft of his PSR. He
filed objections on May 25, 2000 and received an amended PSR on
May 26. On May 31 and June 5, Correy filed objections to the
amended PSR.

 Like Bonilla's PSR, Correy's amended PSR was based
solely on the overt acts alleged in the indictment, and not on any
evidence in the record. In his objections filed June 5, 2000,
Correy specifically argued that the PSR should have been based on
evidence in the record, and not just the overt acts alleged in the
indictment. All of this occurred before Judge Cerezo's order on
July 11, 2000, which, as we have already discussed, applied to all
defendants.
         On April 26, 2002, Correy's co-defendant Nicolai filed a
motion to transfer the case back to Judge Cerezo for sentencing. 
Nicolai also requested a continuance of his sentencing because he
had not received a draft PSR, in violation of Rule 32. On
April 30, 2002, Correy filed a motion to join Nicolai's motion to
transfer and noted that he, too, had not yet received a revised
PSR.

 At his sentencing hearing, Correy told the district court
that he still had not received a final PSR. As with Casas and
Bonilla, the district court attempted to get around the problem by
referring to a trial transcript that contained witness testimony
dealing with Correy's individual drug quantities.
         We believe that, as with Bonilla and Casas, Rule 32(e)
was violated in connection with Correy's sentencing. Correy never
received a revised PSR before sentencing, as he should have
pursuant to Judge Cerezo's order. Correy objected to the lack of
individualized drug quantity findings and also joined a motion that
made an objection based on Rule 32's thirty-five day notice
requirement. While the district court referred to record evidence
at Correy's sentencing, this does not change the fact that Correy
never received a revised PSR. Nor are we persuaded that any error
resulting from this violation was harmless, for the same reasons
that we did not find that the error was harmless in Bonilla's or
Casas's case. Finally, we believe that there is a reasonable
probability that the district court will impose a more favorable
sentence under advisory Guidelines, as Correy will have adequate
time to review the trial transcripts in order to attempt to rebut
the government's claim as to the amount of drugs attributable to
him. We therefore remand Correy's case for re-sentencing.

 As we
noted above, this "remand should not be taken as either a
suggestion or a prediction that the sentence will necessarily be
altered." Heldeman, 402 F.3d at 224.

         5. Apprendi
         With the exception of Bonilla, all of the appellants
argued on appeal that their sentences violated Apprendi. In
Apprendi, the Supreme Court held that "[o]ther than the fact of a
prior conviction, any fact that increases the penalty for a crime
beyond the prescribed statutory maximum must be submitted to a
jury, and proved beyond a reasonable doubt." Apprendi, 530 U.S. at
490.
         All of the appellants were convicted of conspiracy to
possess with intent to distribute approximately 1400 grams of
heroin and 9445 kilograms of cocaine. Under 21 U.S.C. §§ 841(b)
(1)(c) and 846, a defendant who conspires to possess with intent to
distribute an unspecified amount of cocaine or heroin are exposed
to a maximum sentence of twenty years' imprisonment, or thirty
years if the defendant has a prior felony drug offense conviction. 
However, if five kilograms or more of cocaine or one kilogram or
more of heroin are involved, § 841(b)(1)(A) applies and the
statutory maximum becomes life imprisonment. In the instant case,
the district court determined that § 841(b)(1)(A) applied. 
Therefore, the statutory maximum encompassed life imprisonment.
         Appellants argue that the jury did not determine the
amount or quantity of drugs, and that, therefore, the default
statutory maximum of twenty years found in § 841(b)(1)(c) should
have applied. The government argues that the jury instructions
forged the necessary link between the indictment and the verdict so
that the statutory maximum should be life imprisonment.
         This court addressed the relationship between Apprendi
and Booker as to drug quantity determinations in United States v.
Pérez-Ruiz, No. 04-1853, 2005 WL 2046023 (1st Cir. 2005). Although
no defendant can be sentenced under the guidelines beyond a
statutory minimum, under Booker a judge may make the drug quantity
findings necessary to trigger a statutory maximum. Id. at *2. As
we said in Pérez-Ruiz,
[u]nder the 5-4 constitutional ruling in
Booker, judge-made enhancements under the
guidelines that result in a sentence greater
than the sentence that could be imposed based
solely on the facts found by the jury do
amount to Sixth Amendment violations if the
guidelines are treated as mandatory; but under
the companion 5-4 remedial ruling in Booker,
this problem is washed out by treating the
guidelines as advisory. A defendant sentenced
under the mandatory regime may be entitled to
re-sentencing under the advisory one[,] . . .
but Booker both created and cured the
constitutional error at the same time.

Id. Given the jury instructions, there is some doubt about the
correctness of the government's argument that the problem of drug
quantity was taken care of by the jury verdict that found the
defendants guilty as conspirators. That is beside the point
because the evidence overwhelmingly establishes that the conspiracy
involved at least five kilograms of cocaine or one kilogram of
heroin, which are the amounts necessary to support a statutory
maximum of life imprisonment.

 See United States v. Soto-Beníquez,
356 F.3d 1, 48 (1st Cir. 2004) (stating that, for Apprendi
purposes, "the conspiracy-wide drug quantity determines the
statutory maximum").

 The two main government witnesses, Pérez and
Martínez, were co-conspirators who testified that they moved
various shipments of cocaine and heroin totaling thousands of
kilograms of cocaine and hundreds of kilograms of heroin. The
government also had at least seven other co-conspirators testify to
various amounts of cocaine and heroin that well-exceeded the
threshold necessary for § 841(b)(1)(A) to apply.
         In the face of this evidence, appellants attempt to
attack the credibility of Pérez and Martínez and quibble with the
evidence regarding the amounts attributable to them individually. 
However, they point to no evidence contradicting the conspiracy-wide drug quantities testified to at trial, nor do they offer any
explanation for why the jury would believe the government witnesses
regarding each appellant's activities in furtherance of the
conspiracy, yet discredit their testimony regarding the type or
quantity of drugs involved in the conspiracy. See id. at 47
(stating pre-Booker that we have found an Apprendi error harmless
where "the jury could not have convicted without crediting
informant testimony, the same informant testified to the drug
amount, and the defendant offered no reasons to disbelieve the
testimony except a general attack on the witness's credibility"). 
Because the evidence is overwhelming, on remand for re-sentencing
the appropriate statutory maximum will be life imprisonment as
stated in § 841(b)(1)(A).
C. Custody of Nicolai
         We turn to one final issue. When Nicolai was indicted in
Puerto Rico, he was already serving a sentence of eleven years to
life in New York state prison after pleading guilty to conspiracy
to possess with intent to distribute narcotics. Nicolai was
transferred to federal custody in Puerto Rico pursuant to a writ of
habeas corpus ad prosequendum ("writ") issued in October 1996. At
his sentencing on July 31, 2002, Nicolai asked that he be
transferred back to New York state prison in order to be closer to
his family. On September 17, 2002, the sentencing judge executed
an Amended Judgement of Conviction. In committing Nicolai to the
care of the United States Bureau of Prisons ("BOP"), the sentencing
judge recommended that Nicolai serve his sentence in the state of
New York. The sentencing judge noted that his recommendation was
non-binding because "any decision regarding prison assignment or
custody falls squarely within the power of the executive branch." 
On September 27, 2002, the New York Department of Correctional
Services received a letter from the U.S. Attorney requesting that
New York release jurisdiction of Nicolai so that he could serve his
federal sentence in federal prison. It complied, and Nicolai is
currently in federal prison.
         Nicolai now argues that under the Interstate Agreement on
Detainers Act ("IADA"), 18 U.S.C. App. 2 § 2, he must be returned
to New York state prison because that is where he was before he was
transferred to federal custody pursuant to the writ. We disagree. 
From our review of the record, it appears that Nicolai was brought
into federal custody by means of a writ of habeas corpus ad
prosequendum, not a detainer.

 While the use of a detainer invokes
the IADA, the use of a writ of habeas corpus ad prosequendum does
not. United States v. Mauro, 436 U.S. 340, 349 (1978); United
States v. Beard, 41 F.3d 1486, 1489 (11th Cir. 1995). Therefore,
the IADA is inapplicable.
         We note further that, generally, a state that sends a
prisoner in state custody to federal authorities pursuant to a writ
of habeas corpus ad prosequendum retains jurisdiction over the
prisoner because the prisoner is merely "on loan" to the federal
authorities. See, e.g., Jake v. Herschberger, 173 F.3d 1059, 1062
n.1 (7th Cir. 1999); United States v. Evans, 159 F.3d 908, 912 (4th
Cir. 1998); Thomas v. Brewer, 923 F.2d 1361, 1366-67 (9th Cir.
1991). However, in the instant case, the federal and state
authorities reached an agreement allowing the United States to keep
Nicolai in federal prison. See Weekes v. Fleming, 301 F.3d 1175,
1181 (10th Cir. 2002) (stating that a state may choose "to
relinquish or transfer its primary custody to the United States"). 
We therefore find no error in Nicolai's confinement in federal
prison.
III. ConclusionFor the foregoing reasons, the appellants' convictions
are affirmed. We vacate their sentences and remand for re-sentencing consistent with this opinion.
         Appellants convictions are affirmed, and their sentences
vacated and remanded for re-sentencing.